**BANQUE ARABE ET INTERNATIONALE D'INVESTISSEMENT**

v.

**MARYLAND NATIONAL BANK.**

No. 90 Civ. 6433 (RJW).

United States District Court, S.D. New York.

April 23, 1993.

Joseph H. Levie, Mark Holland, Joanne M. Scalard, Donald E. Griffith, Rogers & Wells, New York City, for plaintiff.

James A. Moss, Harvey S. Feuerstein, Susan L. Meekins, Herrick, Feinstein, New York City, for defendant.

## OPINION

ROBERT J. WARD, District Judge.

Defendant Maryland National Bank ("MNB") has moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment in the above-captioned action. Plaintiff Banque Arabe et Internationale d'Investissement ("Banque Arabe") opposes the motion. For the reasons that follow, the motion is granted in part and denied in part.

This action arises in the aftermath of a real estate deal gone sour. In 1988, defendant arranged a $35 million package of loans to eight real estate partnerships, each owned or controlled by Robert K. Marceca. Plaintiff is the former beneficial owner of BAII Banking Corp. ("BAII"),[1] which purchased a $10 million participation interest in this $35 million loan package. The real estate partnerships ultimately defaulted on their loans and the collateral securing the loans was sold at a substantial loss, thereby virtually insuring that the real estate partnerships will be unable to repay the bulk of the $10 million loan purchased by BAII. The question now before this Court is whether the holder of the participation interest (Banque Arabe by way of BAII) or the packager of the participation interests (MNB) must bear the loss resulting from the unpaid loan.

## BACKGROUND

The instant motion is made upon a set of stipulated facts. The undisputed facts which are relevant to a determination of the legal questions involved are as follows:

*The Marceca Loan and Participations*

On June 23, 1988, MNB made a mortgage loan ("the Marceca loan"), arranged by its merchant banking affiliate, MNC International Bank ("MNCIB"), in the principal

---

1. BAII was dissolved voluntarily in 1992.

amount of $35 million, to 1 East 93rd Associates, 36 East 64th Associates, 55 West 89th Associates, 57 West 89th Associates, 405 East 72nd Owners Corporation, 51st Owners Corporation, 107 East 63rd Owners Corporation and 342 East 67th Owners Corporation (collectively "the Marceca borrowers"). Each of these borrowers was owned or controlled by Robert K. Marceca. Repayment of the loan was secured by individual mortgages ("the Marceca mortgages") on eight rent-controlled or rent-stabilized apartment buildings located in Manhattan (collectively "the Marceca properties").[2] The purpose of the Marceca loan was to finance the acquisition, renovation and conversion to cooperative or condominium ownership of the eight Marceca properties.

The MNB officers who were assigned to work on the Marceca loan in 1988 were employed by MNCIB and were compensated, in part, in the form of bonuses based upon the profitability of MNCIB. Sales of participation interests in the Marceca loan would have increased MNCIB's profitability in 1988, which then would have increased the amount of compensation received by those MNCIB officers who were assigned to the Marceca loan and the effort to sell participations in this loan.

Four banks unaffiliated with MNB purchased a total of $25 million in participation interests in the $35 million Marceca loan.[3] Part of this $25 million package was the $10 million participation interest purchased by BAII. This interest was effectuated by a participation agreement between BAII and MNB which was executed on September 29, 1988 and became effective October 3, 1988 ("the Participation Agreement"). On October 3, 1988, BAII paid $10 million to MNB.[4]

*BAII's Due Diligence and the June 1988 Loan Paydown Schedules*

MNCIB first approached BAII concerning the possible purchase of a participation interest in the Marceca loan in May 1988. Arm's length negotiations between MNCIB and BAII ensued. In June 1988, MNCIB provided BAII with projected loan paydown schedules ("the June 1988 loan paydown schedules"). These schedules were initially prepared by the Marceca borrowers and submitted to MNCIB, which reviewed and discussed them with the Marceca borrowers. The repayments referred to in the June 1988 loan paydown schedules were, and were understood by BAII to be, projected prepayments of the principal amount of the proposed Marceca loan to be made out of the proceeds from the conversion to cooperative ownership of the eight apartment buildings identified in the schedules. BAII was aware that the June 1988 loan paydown schedules were based on a number of assumptions, including, *inter alia*, that (a) the first projected repayment allocable to each building would be made at the time of the closing of the conversion of the building to cooperative ownership, and (b) the closing of the conversion of each building would occur 90 days after an offering plan for the conversion of the building was accepted for filing by the New York State Department of Law ("the Department of Law").

2. Each Marceca borrower owned a separate parcel of real property as follows:

| Marceca Borrower | Marceca Property |
| --- | --- |
| 1 East 93rd Associates | 1 East 93rd Street |
| 36 East 64th Associates | 36 East 64th Street |
| 55 West 89th Associates | 55 West 89th Street |
| 57 West 89th Associates | 57 West 89th Street |
| 405 East 72nd Owners Corporation | 405–411 East 72nd Street |
| 51st Owners Corporation | 214 East 51st Street |
| 107 East 63rd Owners Corporation | 107 East 63rd Street |
| 342 East 67th Owners Corporation | 305–315 West 13th Street |

3. MNCIB attempted to sell MNB's remaining $10 million interest in the $35 million Marceca loan, but was unable to do so.

4. BAII assigned certain rights it possessed under the Participation Agreement to Banque Arabe pursuant to an assignment executed by BAII effective May 31, 1990. As will be discussed *infra*, the parties disagree concerning the scope of the rights transferred by BAII.

The parties agree that the June 1988 loan paydown schedules were "realistic" based on the information available to the Marceca borrowers at the times the schedules were prepared. Stipulation of Agreed Facts for Defendant's Summary Judgment Motion at ¶ 31 (hereinafter "Stipulation of Agreed Facts"). MNCIB knew that BAII would use these loan paydown schedules in making its credit analysis of the Marceca loan and would rely on them in deciding whether to purchase a participation interest in the loan.

In June and July of 1988, BAII conducted its own due diligence investigation and credit analysis of the Marceca loan. As part of this process, officers of BAII reviewed documents supplied by MNCIB and had numerous conversations with MNCIB. These conversations included a meeting with Robert K. Marceca.

BAII completed its due diligence investigation by July 13, 1988. At no time during its investigation and credit analysis did BAII request any information or documents from the Department of Law concerning the proposed conversion of the apartment buildings. On July 13, 1988, BAII informed MNCIB of its intention to purchase a $10 million participation interest in the Marceca loan.

*Procedure for Department of Law Approval of Apartment Conversion Plans*

Before an apartment building may be converted to cooperative ownership in New York State, the conversion plan must be accepted for filing by the Department of Law. This process involves three steps: the "red herring stage," the "black book stage," and the "post-effectiveness stage."

In the red herring stage, the sponsor submits a draft proposed offering plan, or "red herring", to the Department of Law and simultaneously provides copies of the red herring to existing tenants of the building. The Department of Law reviews the contents of the red herring and either accepts the plan for filing, issues a deficiency letter to the sponsor, or rejects the plan for filing. The Department of Law is required to take one of these actions within six months of the red herring's submission. During the red herring stage, no advertising, offers, or sales can legally take place. If the Department of Law issues a deficiency letter, the sponsor is given an opportunity to cure the deficiencies. If the Department of Law rejects the red herring, a revised red herring must then be filed if the sponsor wishes to proceed with the conversion.

If the Department of Law determines that there is full and fair disclosure in the plan and complete regulatory and statutory compliance, the Department of Law advises the sponsor that the plan will be accepted for filing as soon as a final plan, called a "black book," is filed. Once the black book is filed, the sponsor may begin to advertise the apartments for sale and enter into contracts, subject to the right of tenants to purchase their apartment units. No closings can take place, however, until the plan is declared effective. The contracts entered into during the black book stage are called "subscription agreements" and are contingent upon the plan becoming effective. The plan becomes effective when the sponsor enters into subscription agreements with tenants in occupancy for a fixed percentage of apartments and files an amendment to the plan declaring it effective. Only after the plan is declared effective can the closing of the conversion of the building to cooperative ownership and the closing of the sale of individual apartment units occur.

*Delays in Converting the Marceca Properties and the Co–Sponsorship Issue*

A red herring for 1 East 93rd Street was submitted by the Marceca borrowers to the Department of Law in January 1987. Some time before September 1988, a deficiency letter was issued by the Department of Law for this red herring. The black book offering plan for 1 East 93rd Street was not accepted for filing by the Department of Law until June 1989. No apartment units in this property were ever sold by the Marceca borrowers.

In March 1988, a red herring for 305–315 West 13th Street was filed by the previous owner of that property. Ownership changed in June 1988. On or about October 28, 1988, the Marceca borrowers submitted revised offering plan documents reflecting the June 1988 change in ownership. The offering plan

for this property was accepted for filing by the Department of Law in April 1989. No apartment units in that building were ever sold by the Marceca borrowers.

Thus, at the time the Marceca loan closed on June 23, 1988, red herrings had been submitted for the conversions of properties at 1 East 93rd Street and 305–315 West 13th Street. A red herring was submitted to the Department of Law for 36 East 64th Street by the Marceca borrowers in May 1989, but was never accepted for filing. No red herrings were ever submitted for the remaining five Marceca properties.

By the end of 1989, the Marceca borrowers had not converted any of the Marceca properties to cooperative ownership. The inability of the Marceca borrowers to complete these conversions was the direct result of delays within the Department of Law stemming from the department's objection to the fact that MNB was not identified as a cosponsor of the proposed offering plans submitted by the Marceca borrowers, despite the fact that MNB had a right, under the terms of the Marceca mortgages, to approve the terms of the offering plans ("the cosponsorship issue"). The delay in the conversion process arising out of the co-sponsorship issue eventually caused the Marceca borrowers to default on the Marceca loan.

*Non–Disclosure to BAII of the Co–Sponsorship Issue*

The Department of Law first brought the co-sponsorship issue to the attention of MNCIB in mid-August 1988, over a month before BAII purchased its participation interest in the Marceca loan. However, despite the fact that MNCIB officers knew this issue could materially delay projected payments of the Marceca loan as set forth in the June 1988 loan paydown schedules, MNCIB chose not to disclose to BAII the existence of the co-sponsorship issue or its potential adverse impact on the June 1988 projected loan paydown schedule. Officers of MNCIB have testified that information regarding the co-sponsorship issue would have been material to a potential participant such as BAII.

Between July 13, 1988 and October 3, 1988, in the course of discussing issues related to the proposed cross-collateralization of the Marceca loan, BAII officers inquired generally of MNCIB officers about the Marceca loans, and were told that there were "no significant problems." Stipulation of Agreed Facts at ¶ 73. BAII did not request additional information from MNCIB after July 13, 1988 because BAII believed, based on its understanding of banking industry practices and certain communications between MNCIB and BAII on or before July 13, 1988, that after BAII had completed its due diligence investigation, MNCIB would have informed BAII of any material adverse changes in the information that had already been provided by MNCIB to BAII. BAII did not convey its understanding of banking industry practices or its expectations to MNCIB because BAII did not perceive any need to do so.

As indicated above, BAII completed its due diligence investigation in connection with the Marceca loan by July 13, 1988, before the co-sponsorship issue was raised by the Department of Law. Between July 13, 1988 and October 3, 1988, BAII did not request any information from the Marceca borrowers, their counsel or Marceca himself about the status of the proposed conversion of the Marceca properties because, in BAII's view, based upon its understanding of banking industry practices, such a request would have been "inappropriate." Stipulation of Agreed Facts at ¶ 70. BAII was not, however, legally prohibited from requesting such information, including the status of proceedings before the Department of Law, from Marceca, the Marceca borrowers or their counsel.

Between July 13, 1988 and October 3, 1988 neither Marceca nor anyone else within the Marceca organization informed BAII of the co-sponsorship issue. However, had BAII asked the Marceca borrowers about the status of the conversion plans under consideration by the Department of Law, it is unlikely that BAII would have been told about the co-sponsorship issue. As Daniel Kingsford, a principal of two of the Marceca borrowers, testified at his deposition:

Q: Did you ever have any discussions with any of the participants regarding

the situation of the attorney general in August or September of 1988?

A: I had no discussions with participants period.

Q: What, in the normal course of your business practices, would you have done if one of the participants had asked you whether or not there was a problem with the attorney general in August or September of 1988?

A: Well, the way [MNCIB] had asked us to deal with any questions after that one call from participants, I can't tell you what I would have done to a direct question, but if they had contacted us, I would have put them off until I had called [MNCIB] and said, "How do you want me to do this?" We had been asked to refer any questions or correspondence from outside banks to [MNCIB]. That's what we would have done.

Q: That included potential participants as well as people who had already bought a piece of the loan?

A: Yes. We were trying to cooperate with [MNCIB]. We were in a position of having borrowed a great deal of money from them. I think in that situation we would have simply asked the bank to deal with their people.

Stipulation of Agreed Facts at ¶ 78 (quoting Kingsford Deposition Tr. 89–90).

Finally, BAII could not have learned of the co-sponsorship issue by making independent inquiries to the Department of Law concerning the red herrings submitted by the Marceca borrowers because the policy of the Department of Law was not to disclose or comment upon matters, such as the co-sponsorship issue, that had been referred to the department's Enforcement Division. In fact, between July 13, 1988 and October 3, 1988, BAII did not obtain or attempt to obtain any information from the Department of Law concerning the existence or status of proposed offering plans for the Marceca properties.

Thus, BAII was unaware of the co-sponsorship issue when it purchased its participation interest. Had BAII been aware of this issue, it would have elected not to purchase a participation interest in the Marceca loan.

*Resolution of the Co–Sponsorship Issue*

In January, 1989, the co-sponsorship issue was finally resolved by modifying the loan documents to eliminate MNB's right to approve the terms of the offering plans submitted for filing by the Marceca borrowers. On January 19, 1989, MNB formally advised BAII of MNB's intent to modify the terms of the Marceca mortgages securing the repayment of the Marceca loan, in order to resolve the co-sponsorship issue. MNB did not request or receive BAII's written consent to this modification and BAII did not notify MNB of any opposition to the modification.

From October 3, 1988 to December 31, 1989, BAII received monthly interest payments at the rate stipulated in the Participation Agreement.

*Failure of the Marceca Borrowers to Comply with the Terms of the Marceca Mortgages and Foreclosure of the Mortgages*

Beginning in December, 1988, the Marceca borrowers did not comply fully or promptly with their reporting obligations under the terms of the Marceca mortgages. On August 25, 1989, MNB issued notices of failure to pay taxes and failure to correct violations to the Marceca borrowers, pursuant to the terms of the Marceca mortgages securing repayment of the Marceca loans. MNB issued notices of default and acceleration to the Marceca borrowers on December 14, 1989, which set forth the events of default. Pursuant to these notices of default and acceleration, the unpaid principal balance of the Marceca mortgage and notes executed by the Marceca borrowers to MNB on June 23, 1988 in the aggregate original principal amount of $47,500,000 became due and payable in full.

On or about March 26, 1990, a settlement agreement (the "Consensual Foreclosure Agreement") was executed by MNB, the Marceca borrowers and Marceca. Pursuant to this agreement, the Marceca borrowers surrendered possession and control of the Marceca properties to MNB on or about April 12, 1990 and executed a stipulation consenting to MNB's foreclosure of the mort-

gages securing the Marceca loan. In exchange, MNB agreed, among other things, to pay to the Marceca borrowers $2,337,600 and to release Marceca from liability for his personal guarantee. MNB charged BAII for its pro rata share of the payments to the Marceca borrowers.

By letter, dated March 13, 1990, MNB requested, pursuant to the Participation Agreement, that BAII consent to MNB's release of Marceca's personal guarantee of the Marceca loan under the Consensual Foreclosure Agreement. On or about April 9, 1990, BAII notified MNB it would not do so.

In April, 1990, MNB commenced an action, which was unopposed, to foreclose the mortgages securing the Marceca loan. In August 1990, Robert K. Marceca filed for bankruptcy. On April 2, 1991, a Judgment of Foreclosure and Sale was entered in favor of MNB and against the Marceca borrowers directing that the mortgaged properties be sold to satisfy the mortgage indebtedness in the amount of $56,486,893.06 plus interest.

In May, 1991, the Marceca properties were sold at public auction. MNB was the successful bidder. In June, 1991, MNB resold the Marceca properties for $11,337,500.

BAII received $1,843,140 as its share of the foreclosure sale proceeds net of its pro rata share of the costs incurred by MNB, including the $2,337,600 payment to the Marceca borrowers. In addition, BAII received its pro rata share of the net rental income collected for the Marceca properties during the pendency of the foreclosure action.

## DISCUSSION

### I. Standards for Granting Summary Judgment

The standards for granting summary judgment are well-established. Only when "there

is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law" may summary judgment be granted. Rule 56(c), Fed.R.Civ. P., quoted in Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir.1991).

In a summary judgment motion involving the construction of contractual language, the parties' "intent is all [and] the language used must be examined first to see if it is ambiguous." Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir.1990). A court may grant the motion "only where the language and the inferences to be drawn from it are unambiguous." Id. (emphasis in original) (construing contract applying New York law) (citing American Home Assurance Co. v. Baltimore Gas & Elec. Co., 845 F.2d 48, 50–51 (2d Cir.1988)). Thus, a motion for summary judgment must be denied if the intent of the contracting parties is subject to more than one reasonable interpretation.

### II. Plaintiff's Standing to Assert Tort Claims

This Court must determine, as a threshold issue, whether plaintiff has standing to assert the tort claims alleged in the complaint.[5] As described above, the Participation Agreement was entered into by MNB and BAII. On May 31, 1990, BAII executed an assignment ("the Assignment") of certain "rights, title and interest" to Banque Arabe, the plaintiff in this action.[6]

It is undisputed that any contract claims created by the Participation Agreement in favor of BAII were transferred by the Assignment from BAII to Banque Arabe.

---

**5.** These claims are for common law fraud, negligent misrepresentation, breach of fiduciary duty and gross negligence.

**6.** The Assignment provides, in relevant part,
[A]s of May 31, 1990 [BAII] ("Assignor") ... has sold, assigned, transferred, and conveyed, and by these presents does sell, assign, transfer and convey unto [Banque Arabe] ("Assignee"), without recourse to the Assignor, all of [BAII's] rights, title and interest in
(a) the Participation Agreement ... and

(b) [BAII's] participation in a loan made by [MNB] on or about June 23, 1988 to 1 East 93 Associates ..., 55 West 89th Associates ..., 107 East 63rd Owners Corp. ..., 342 East 67th Owners Corp. ... in the original principal amount of $35,000,000 ...,
Together with all of [BAII's] rights and interests in the transaction described in Paragraphs (a) and (b) above....
Stipulation of Agreed Facts, Ex. H.

However, defendant argues that those *tort* claims arising from the BAII–MNB transaction were not transferred from BAII to Banque Arabe in the Assignment, thereby depriving Banque Arabe of standing to assert such claims. Plaintiff counters that either: (a) the Assignment did transfer these tort claims or, in the alternative, (b) the Assignment was ambiguous on the question of tort claim transfer and therefore the question cannot be resolved on a motion for summary judgment.

■ Under New York law, an assignment of the right to assert contract claims does not automatically carry with it an assignment of the right to assert tort claims relating to the transaction which established the contract. The assignor must also transfer the cause of action for tort claims to the assignee. *See Nearpark Realty Corp. v. City Investing Co.,* 112 N.Y.S.2d 816 (Sup.Ct.1952). However it is not necessary for an assignment to contain specific "boilerplate" language in order to transfer a cause of action. "[A]ny act or words are sufficient which 'show an intention of transferring the chose in action to the assignee....' " *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548 (2d Cir.1976) (quoting *Advance Trading Corp. v. Nydegger & Co.,* 127 N.Y.S.2d 800, 801 (Sup.Ct.1953)).

This Court must determine whether the parties to the Assignment intended to transfer BAII's tort claims to Banque Arabe. In support of its position, plaintiff points to the interplay between clause (a) and clause (b) of the Assignment. Clause (a) provides for the assignment of "all of [BAII's] rights, title and interest in ... the Participation Agreement," while clause (b) provides for the assignment of "all of [BAII's] rights, title and interest in ... [BAII's] participation in the [Marceca loan]." In addition, the Assignment sells, assigns, transfers and conveys, "all of [BAII's] rights and interests in the transaction described in Paragraphs (a) and (b) above" (the "transaction language"). Banque Arabe contends that clause (a) transfers BAII's contract claims, while clause (b) and the "transaction language" transfer BAII's tort claims.

Defendant asserts that the text and structure of the Assignment are open to only one interpretation: that BAII's right to bring tort claims were not transferred to Banque Arabe. MNB argues that clause (b) does not refer to the activities of BAII and MNB in connection with the Marceca loan transaction, activities which might give rise to a fraud claim, but rather to BAII's participation interest acquired pursuant to the Participation Agreement. Furthermore, defendant asserts that the "transaction language" refers only to BAII's interest in the Participation Agreement and does not refer to those activities which culminated in the signing of the Participation Agreement.

■ Despite the efforts of each party to put its "spin" on the meaning of the Assignment, the Court finds that neither the stipulated facts nor a close reading of the Assignment allows the Court to make a definitive determination with regard to the assignment of tort claims issue. Clause (b) and the "transaction language" can reasonably be read in accordance with either party's interpretation: the word "transaction" can refer either to the *process* of negotiating and reaching agreement on BAII's participation in the Marceca loan or to the *outcome* itself, i.e. the Participation Agreement. Given this ambiguity on the face of the Assignment, it is appropriate for the Court to receive extrinsic evidence or oral testimony concerning the intention of those who were parties to the Assignment as to whether it was their intent to transfer BAII's tort claims to Banque Arabe. *See Bank of America Nat'l Trust and Sav. Ass'n v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985). Accordingly, the question of whether plaintiff has standing to assert the tort claims cannot be resolved on a motion for summary judgment, *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990), and this part of defendant's motion is denied.

III. *Count I: Plaintiff's Common Law Fraud Claim*

A. *MNB's* [7] *Duty to Disclose*

Count I revolves around two time-honored and sometimes conflicting legal principles:

---

7. In their papers, the parties have not distin-

guished between the legal and contractual duties

*caveat emptor* and a seller's duty to disclose. The basic fact pattern presented in this case is hardly unique: when negotiating a contract, one party does not ask enough questions and the other party does not volunteer information which it knows would cause the first party not to sign the contract. This Court, applying New York law, must determine which party should bear the burden of any losses suffered by the first party as a result of the lack of complete information.

Plaintiff alleges in Count I that MNB defrauded BAII because "MNB knew that BAII was relying upon the projected [Marceca loan repayment] schedule and information [concerning the loan repayment] in deciding whether to purchase its Participation interest, and intentionally failed to disclose to BAII either the delays in those schedules, the errors in the information, or the problems raised by the Department of Law" concerning the co-sponsorship issue. Complaint at ¶ 38.

The co-sponsorship issue was first brought to the attention of MNCIB in August 1988. MNCIB was fully aware that this issue arose *after* BAII had completed its due diligence investigation on July 13, 1988 and that, at the time the Participation Agreement was executed, BAII did not know of this issue or its ramifications. At no point prior to execution of the Participation Agreement did MNCIB disclose to BAII the existence of the co-sponsorship issue or its potential adverse impact on the June 1988 loan paydown schedule.

Officers of MNCIB testified at their depositions that information regarding the co-sponsorship issue and the anticipated delays would have been material to a potential participant such as BAII. Stipulation of Agreed Facts at ¶ 67. Furthermore, the parties stipulate that MNCIB knew that BAII would use the June 1988 loan paydown schedules in making its credit analysis of the Marceca loan and would rely on them in deciding whether to purchase a participation interest in that loan. *Id.* at ¶ 33. Despite its knowl-

edge that BAII was relying on inaccurate information, MNCIB chose not to inform BAII of the co-sponsorship issue. Had BAII been made aware of the co-sponsorship issue, it would have elected not to purchase a participation interest in the Marceca loan. *Id.* at ¶ 60.

■ The Second Circuit has recently explained when a duty to disclose exists under New York law:

A duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of *caveat emptor* is still alive and well. New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984)

*Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2nd Cir.1993) (other citations omitted). Plaintiff relies on the third category, "where one party possesses superior knowledge, not readily available to the other," as the legal basis for Count I.

■ Superior knowledge is necessary, but not sufficient, to create a duty to disclose. In the instant matter, it is undisputed that defendant possessed superior knowledge concerning the Department of Law's actions. However, the duty to disclose is imposed only when the material knowledge is not "readily available" to the injured party. *Id.* at 151. Therefore, if the existence of the co-sponsorship issue were readily available to

and responsibilities of MNCIB and MNB. For example, although BAII dealt with MNCIB employees prior to signing the Participation Agreement, plaintiff alleges MNB had a duty to dis-

close. Accordingly, the Court will refer to these two entities interchangeably throughout its discussion.

BAII, MNCIB would not have had a duty to disclose.

On the basis of the stipulated facts, the Court concludes that knowledge of the co-sponsorship issue and the attendant delays was *not* readily available to BAII. In reaching this conclusion, the Court relies primarily on *Brass*, where the Second Circuit wrote,

> [i]n general where a buyer has an opportunity equal to that of a seller to obtain information, such information is "readily available," and the buyer is expected to protect himself in a business transaction. Yet, in an increasing number of situations, a buyer is not required to conduct investigations to unearth facts and defects that are present, but not manifest. For example, a buyer is not expected to discover that a house is infested with termites, a prospective investor is not required to uncover that an amusement center offered for sale will produce lower monthly income because it has been raided by the police for illicit activities on the premises, and a purchaser of a note from one who is not the maker is not expected to uncover facts showing the worthlessness of the paper on account of its maker's insolvency or because it has been paid. In those sorts of circumstances a buyer may safely rely on the seller to make full disclosure.

*Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 151 (citations omitted).

While MNCIB learned about the existence of the co-sponsorship issue in mid-August 1988, BAII was not notified about the issue. Only three entities knew of the co-sponsorship issue: the Department of Law, the Marceca borrowers, and MNCIB.

BAII could not have learned about the co-sponsorship issue from the Department of Law because it was department policy not to comment publicly upon matters, such as the co-sponsorship issue, that were referred to the department's Enforcement Division.

Furthermore, BAII could not have learned of the existence of this issue from the Marceca borrowers because MNCIB had instructed the Marceca borrowers not to discuss with potential participants, such as BAII, actions taken by the Department of Law with respect to the co-sponsorship issue. Thus, given that BAII was not in a position to learn of the co-sponsorship issue from either the Department of Law or the Marceca borrowers, it cannot be said that BAII "ha[d] an opportunity equal to that of [MNCIB] to obtain information." *Id.*

Without a doubt, BAII could have been more aggressive in seeking information concerning the status of the Marceca properties. As MNB notes, BAII did not request any information from the Marceca borrowers, their counsel or Marceca between the date due diligence was completed (July 13) and the date the Participation Agreement became effective (October 3).[8] Furthermore, between these dates, BAII made no attempt to obtain any information from the Department of Law concerning the existence or status of proposed offering plans for the Marceca properties.

However, between July 13 and October 3, BAII did inquire of MNCIB concerning the status of the Marceca loans and was told there were "no significant problems." *Id.* at ¶ 73. Beyond this general request, however, BAII did not ask for any specific information from MNCIB after July 13. In short, BAII did not engage in a *60 Minutes*-style investigation of the status of the necessary Department of Law approvals.

Such an investigation was not required of the buyer. The fact remains that, while the existence of the co-sponsorship issue was, in the words of the *Brass* court, "present," it was far from "manifest" for someone in BAII's position. Manifest has been defined as "obvious to the understanding, evident to the mind, not obscure or hidden, ... synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." *Black's Law Dictionary* 962 (6th ed. 1990). While further investigation by BAII, including direct questioning of the Department of Law, Marceca or MNCIB, might ultimately have lead to discovery of the co-sponsorship issue, its presence was far from manifest.

8. BAII believed such a request would be "inappropriate." Stipulation of Agreed Facts at ¶ 70.

The unmistakable trend in New York tort law is to apply the rule of superior knowledge in an increasing number of situations where the rule of *caveat emptor* once applied:

"It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when ... he would reasonably expect a disclosure." *Gaines Serv. Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 697 [432 N.Y.S.2d 760] (N.Y.Civ.Ct.1980), *aff'd without opinion,* 113 Misc.2d 752 [453 N.Y.S.2d 391] (N.Y.App.Term.1981). New York has joined other jurisdictions in limiting the "privilege to take advantage of ignorance," *Restatement (Second) of Torts,* § 551 cmt. 1 (1977); *accord Chiarella v. United States,* 445 U.S. 222, 247–48 [100 S.Ct. 1108, 1124–25, 63 L.Ed.2d 348] (1980) (Blackmun, J., dissenting), and has rejected "the dubious business ethics of the bargaining transactions with which deceit was at first concerned," W. Prosser, *Handbook of the Law of Torts* § 106, at 696 (4th ed. 1971); *accord Gaines Serv.,* 105 Misc.2d at 697 [432 N.Y.S.2d 760].

*Brass v. American Film Technologies, Inc.,* 987 F.2d at 151.

In the instant matter, on the basis of the stipulated facts, the Court finds that MNB possessed superior knowledge about the co-sponsorship issue, not readily available to BAII, and therefore that MNB had a duty to disclose to BAII the delay in Department of Law approval and the reasons for the delay.

B. *BAII's Disclaimers in the Participation Agreement*

MNB asserts that the express terms of the Participation Agreement negated any duty to disclose by MNCIB. In particular, MNB argues that, by the terms of the Participation Agreement, BAII indicated that it had conducted an independent credit analysis and was basing its decision to acquire a participation interest on its own analysis "without reliance on MNB." BAII responds that the express terms of the Participation Agreement do not bar an action for fraud.

It is not necessary for this Court to determine the intent of the parties to the Participation Agreement, because New York law provides that, "[e]ven an express disclaimer will not be given effect where the facts are peculiarly within the knowledge of the party invoking it." *Stambovsky v. Ackley,* 169 A.D.2d 254, 572 N.Y.S.2d 672, 677 (1991) (citing *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959); *Tahini Invs., Ltd. v. Bobrowsky,* 99 A.D.2d 489, 470 N.Y.S.2d 431 (1984)); *see Yurish v. Sportini,* 123 A.D.2d 760, 507 N.Y.S.2d 234, 235 (1986).

Defendant points to a number of New York and federal cases which hold that, when a contract expressly provides that the buyer did not rely on the seller's representations, the buyer may not then bring a fraud action, arguing that it relied on seller's oral misrepresentations. None of the cases cited by defendant, however, involved a situation, such as is present here, where a seller possessed superior knowledge, not readily available to the buyer.

On the basis of the stipulated facts, the Court has found, *supra,* that knowledge of the co-sponsorship issue and its implications for delay in approval of the conversions was, from BAII's perspective, "peculiarly within the knowledge" of MNB. Accordingly, even an express disclaimer in the Participation Agreement would not negate MNB's duty to disclose.

Inasmuch as MNB had a duty to disclose which was not negated by the Participation Agreement, defendant's motion to dismiss Count I of the complaint is denied.

IV. *Count II: Plaintiff's Negligent Misrepresentation Claim*

In Count II of the complaint, plaintiff alleges that,

[d]uring the course of negotiations to induce MNB to purchase the Participation, MNB made negligent misrepresentations of material facts concerning the Loan and the schedule for repayment thereof, and negligently omitted to state material facts necessary in order to make the statements MNB made, in light of the circumstances

under which they were made, not misleading.

Complaint at ¶ 41. Under New York law, there is no cause of action for negligent misrepresentation "in the absence of a special relationship of trust or confidence between the parties." *Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 474 (S.D.N.Y.1992) (citing *Accusystems, Inc. v. Honeywell Information Systems, Inc.*, 580 F.Supp. 474 (S.D.N.Y.1984); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63–64 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)).

■ Neither an ordinary contractual relationship nor a banking relationship, without more, is sufficient to establish a "special relationship," which only occurs in the context of a previous or continuing relationship between two parties. *Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. at 474. Finally, "where a future relationship between the parties is the basis of a special relationship, the duration of that relationship must generally be long term." *Id.* (citing *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808 (App.Div.1976); *Mathis v. Yondata Corp.*, 125 Misc.2d 383, 480 N.Y.S.2d 173 (Sup.Ct.1984)).

■ Defendant argues that, on the basis of the undisputed facts, there was no "special relationship" between BAII and MNB which would be grounds for a claim of negligent misrepresentation. The Court agrees. Plaintiff has not pointed to any facts, disputed or undisputed, which establish the existence of an ongoing relationship between BAII and MNB at the time the Participation Agreement was negotiated and executed. Rather, these two parties were sophisticated financial institutions that came together solely to engage in an arm's length transaction to finance the conversion of the Marceca properties. There was no "special relationship." Thus, as a matter of law, there can be no negligent misrepresentation. Accordingly, Count II is dismissed.

## V. *Count III: Plaintiff's First Breach of Contract Claim*

In Count III, BAII claims that, "[b]y entering into the Consensual Foreclosure [Agreement] without the prior written consent of BAII, MNB breached the Participation Agreement by extending the maturity of the principal and interest on the [Marceca loan], reducing the principal and interest on the [Marceca loan], and releasing Collateral and the Guaranty". Complaint at ¶ 46. The "Guaranty" language of Count III apparently refers to Marceca's personal guarantee.

MNB argues that: (1) the Consensual Foreclosure Agreement did not extend the maturity date or reduce the amount of principal or interest on the Marceca loan or release collateral; and (2) even if MNB did breach the Participation Agreement with respect to the release of Marceca's personal guarantee, BAII cannot demonstrate that it sustained any damages as a result of this breach because, at the time of the breach, the guarantee was worthless.

It is well-established that, "summary judgment is appropriate when a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). BAII does not point to any part of the Consensual Foreclosure Agreement which had the effect of, in the words of Count III, "extending the maturity of the principal and interest on the [Marceca loan], reducing the principal and interest on the [Marceca loan], or releasing Collateral" on the Marceca loan. Inasmuch as plaintiff has not made the requisite showing in this regard, summary judgment is appropriate with respect to these claims under Count III.

The remaining claim under Count III concerns the release of Marceca from his personal guarantee. For purposes of the instant motion, defendant does not dispute that the release of Marceca's personal guarantee, without the approval of BAII, was in breach of the Participation Agreement.[9] Rather, de-

9. The Participation Agreement provides, in relevant part, "[MNB] shall not, without the prior

fendant argues that plaintiff cannot demonstrate that it suffered any damages as a result of the release, because BAII cannot show that MNB would have collected any payment from Marceca if he had not been released from his personal guarantee. Defendant points to Marceca's bankruptcy filing in August 1990, the small amount of money recovered to date from the Marceca estate by the Chapter 7 trustee ($10,000), and the numerous administrative expenses and secured party claims against the Marceca estate (over $364,000) which would take priority over any claims on behalf of MNB. With the chances of recovery on Marceca's personal guarantee slim or none, defendant argues, BAII suffered no damage when Marceca was released from his commitment.

Plaintiff does not dispute defendant's damages analysis, arguing instead that it seeks rescission, as well as damages, and that "the availability of rescission obviates any need for plaintiff to quantify its 'damages' at trial." Memorandum in opposition at 41. Plaintiff's contention is defeated, however, inasmuch as BAII did not seek rescission under Counts II through VI of the complaint. Accordingly, in the absence of any evidence of damages sustained by BAII as a result of the release of Marceca from his personal guarantee, the remaining claim under Count III is also subject to dismissal. Therefore, Count III is dismissed in its entirety.

## VI. *Count IV: Plaintiff's Second Breach of Contract Claim*

In Count IV, BAII asserts that MNB breached the Participation Agreement by: "modifying the [Marceca] Mortgages in January 1989 to delete the provisions requiring the Marceca Borrowers diligently to undertake to convert the [Marceca] Properties to cooperative and/or condominium ownership and providing MNB with the right to approve offering plans and the conversions of Properties, without obtaining BAII's prior written consent." Complaint at ¶ 50.

 The parties are in disagreement as to: (a) whether MNB's modification of the Marceca mortgages was a breach of the Par-

ticipation Agreement and (b) whether BAII was damaged as a result of any such breach. Inasmuch as each of these questions involves disputed issues of material facts, summary judgment must be denied.

BAII argues that MNB breached § 4.2 of the Participation Agreement which provides, *inter alia,*

> [MNB] reserves the right, in its sole discretion, in each instance, without prior notice to [BAII] to agree to the modification, waiver or release of any of the terms of the Loan, the Note, the Mortgages or any of the other Collateral Documents ..., *provided that [MNB] shall not, without the prior written consent of [BAII], exercise any such rights which would ... (d) delete from the Collateral Documents, or amend or modify, any event of default set forth therein.*

(emphasis added).

It is undisputed that, in January 1989, MNB modified the Marceca mortgages, by removing language from § 2.17 of the mortgages, which required the Marceca borrowers to, *inter alia,* (a) "diligently undertake to convert the [Marceca properties] to cooperative and/or condominium ownership and thereafter to diligently and continuously pursue such conversion until the Indebtedness shall be repaid in full," and (b) obtain the prior written consent of MNB before (i) converting the mortgaged premises to cooperatives or condominiums, (ii) submitting an offering plan or red herring to the Department of Law or (iii) modifying or withdrawing an offering plan or red herring. MNB neither requested nor received BAII's written consent for this modification to § 2.17.

BAII alleges that the modification of § 2.17 of the Marceca mortgages, while not a direct violation of § 4.2(d) of the Participation Agreement, does have the effect of amending or modifying an event of default which is contained in the Marceca mortgages. In particular, BAII asserts that the event of default that is amended or modified is contained in § 3.05 of the Marceca mortgages:

written consent of [BAII], exercise any such right which would ... release Collateral or guaran-

tors...." Appendix of Exhibits to Stipulation of Agreed Facts, Ex. G, § 4.2.

The occurrence of one or more of the following events ... shall constitute an event of default hereunder ...:

. . . .

Section 3.05. *Other Defaults* The Mortgagor shall fail to duly and promptly perform, comply with or observe any one or more of the terms, covenants, conditions, agreements and stipulations contained in this Mortgage....

With the elimination of the requirements under § 2.17, BAII argues, the Marceca borrowers were no longer required to comply with all of the terms of the original Marceca mortgages, and therefore an event of default under § 3.05 was amended or modified, in violation of § 4.2 of the Participation Agreement.

MNB asserts that this broad interpretation of § 3.05 of the Marceca mortgages would render the first part of § 4.2 of the Participation Agreement meaningless, insofar as MNB would *never* be able to exercise its right to modify, waive or release any of the terms of the Marceca mortgages without BAII approval because such an action would automatically modify or amend an event of default, namely § 3.05. Under BAII's interpretation, MNB argues, the exception created in § 4.2(d) would swallow the general rule created in the first part of § 4.2. For this reason, MNB would give a narrow reading to § 3.05 of the Marceca mortgage, thereby limiting the scope of the § 4.2(d) exception to the general rule created in the first part of § 4.2.

To summarize, MNB's interpretation would significantly limit the scope of § 3.05 of the Marceca mortgage and § 4.2(d) of the Participation Agreement, while BAII's interpretation would read these sections expansively, thereby significantly limiting the scope of the first part of § 4.2 of the Participation Agreement. Returning to the standards for granting summary judgment outlined earlier in this decision, the Court finds that the language and inferences to be drawn from the Participation Agreement and the Marceca mortgages are not unambiguous

and that each party has presented a reasonable, although contradictory, interpretation of § 4.2 of the Participation Agreement and its interaction with §§ 2.17 and 3.05 of the Marceca mortgages. It is therefore necessary for this Court to receive further evidence concerning the intention of the signatories to these documents. Accordingly, summary judgment is inappropriate on this issue.

MNB next argues that, even if it did breach § 4.2(d), BAII cannot prove any damages.[10] While BAII does not directly address this issue in its Memorandum in Opposition, it is at least arguable that redaction of the "diligently undertake to convert" language from § 2.17 caused damage to plaintiff by lessening the fervor with which the Marceca borrowers sought to convert the Marceca properties. At any rate, unlike the breach at issue in Count III, the Court cannot say, on the basis of the stipulated facts alone, that plaintiff suffered no damage as a result of defendant's modification of § 2.17. Accordingly, the motion for summary judgment with respect to Count IV is denied.

## VII. *Count V: Plaintiff's Gross Negligence Claim*

In Count V, plaintiff alleges that MNB "has managed the [Marceca] Loan in a grossly negligent manner since its inception[, acting] with reckless disregard of the consequences of its action and with indifference to the rights of BAII." Complaint ¶¶ 53, 54.

 Plaintiff has not pointed to any independent duty concerning *management* of the Marceca Loan owed BAII by MNB *prior* to execution of the Participation Agreement. Furthermore, to the extent plaintiff seeks to recover for MNB's mismanagement of the Marceca loans *subsequent* to execution of the Participation Agreement, such a claim, seeking recovery of economic losses, properly sounds in contract, not tort, law. *See Carmania Corp. v. Hambrecht Terrell Int'l,* 705 F.Supp. 936, 938–40 (S.D.N.Y.1989). Accord-

---

10. In its reply brief, BAII asserts it is entitled to the remedy of rescission for the breach alleged in Count IV. As with Count III, however, BAII did not seek rescission in the complaint as a remedy for this alleged breach and is therefore precluded from raising such an argument here.

ingly, that part of defendant's motion seeking to dismiss Count V is granted.

## VIII. *Count VI: Plaintiff's Breach of Fiduciary Duty Claim*

 In Count VI, plaintiff asserts that MNB owed BAII fiduciary duties, which MNB breached. However, "[i]n the case of arm's length transactions between large financial institutions, no fiduciary duty exists unless one was created in the agreement." *Banco Espanol de Credito v. Security Pac. Nat'l Bank,* 763 F.Supp. 36, 45 (S.D.N.Y. 1991), *aff'd* 973 F.2d 51 (2d Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3437 (U.S. Nov. 25, 1992) (No. 92–913); *see also First Citizens Fed. Sav. and Loan Ass'n v. Worthen Bank and Trust Co.,* 919 F.2d 510, 513–14 (9th Cir.1990).

Inasmuch as this was an arm's length transaction between BAII and MNB, there is no automatic, status-based fiduciary duty created by the transaction. Furthermore, this Court has been unable to find, and the plaintiff has not identified, any section of the Participation Agreement or related documents which creates such a duty. Accordingly, that part of defendant's motion seeking to dismiss Count VI is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. That part of the motion which seeks to dismiss plaintiff's tort claims because of lack of standing is denied. Likewise, that part of the motion which seeks to dismiss Counts I and IV of the complaint is denied. Finally, that part of the motion which seeks to dismiss Counts II, III, V and VI of the complaint is granted.

The parties are directed to complete discovery by July 22, 1993 and to file a joint pre-trial order by August 23, 1993.

It is so ordered.