**BANQUE ARABE ET INTERNATIONALE D'INVESTISSEMENT, Plaintiff,**

v.

**MARYLAND NATIONAL BANK, Defendant.**

No. 90 Civ. 6433 (RJW).

United States District Court, S.D. New York.

May 4, 1994.

Joseph H. Levie, John K. Carroll, Mark Holland, Donald E. Griffith, Rogers & Wells, New York City, for plaintiff.

Harvey S. Feuerstein, James A. Moss, Susan L. Meekins, Herrick, Feinstein, New York City, for defendant.

ROBERT J. WARD, District Judge.

On April 23, 1993, this Court issued an opinion granting in part and denying in part defendant Maryland National Bank's ("MNB") motion for summary judgment against plaintiff Banque Arabe et Internationale d'Investissement ("Banque Arabe"). 819 F.Supp. 1282 (S.D.N.Y.1993) (*"Banque Arabe I"*). As a result of that decision, only claims for breach of contract and fraudulent inducement remained for trial.[1] Following discovery, however, plaintiff abandoned the breach of contract claim and sought only damages for rescission under the fraud claim.

Plaintiff alleges that defendant fraudulently induced BAII Banking Corp. ("BAII"), a former subsidiary of Banque Arabe, into purchasing a participation interest in a real estate loan by failing to disclose material information and by making material misrepresentations prior to execution of a participation agreement. MNB denies the allegations of fraud and counters that plaintiff is procedurally barred from bringing a fraud claim. In particular, MNB argues that Banque Arabe is not the real party in interest and, therefore, lacks standing. It also asserts that plaintiff ratified the participation agreement by failing to assert the fraud claim in a timely fashion and by accepting benefits under the agreement after being put on notice of facts sufficient to inquire about the fraud.

The Court conducted a bench trial on November 3–10, 1993. Upon a review of the evidence and testimony offered at trial, the parties' pre and post-trial submissions and the applicable law, the Court issues this opinion, which constitutes its findings of fact and conclusions of law, pursuant to Rule 52, Fed. R.Civ.P. For the following reasons, the Court finds that Banque Arabe lacks standing to assert a fraud claim in this action but that it raised its rescission claim in a timely fashion and it did not ratify the participation agreement. The Court also finds that Banque Arabe has failed to prove intent to defraud on the part of MNB by clear and convincing evidence.

## BACKGROUND

The factual background of this case has already been recited in *Banque Arabe I*, with which familiarity is presumed. However, *Banque Arabe I* was based on stipulated facts submitted exclusively for the purposes of the summary judgment motion. Subsequent to discovery, the parties revised the stipulated facts and submitted the newer version together with their pre-trial order. Therefore, the Court deems it necessary to restate those facts pertinent to the issues raised at trial.

### A. *The Marceca Loans and the Participation Agreement*

The loan at issue was a mortgage loan arranged by MNB's merchant banking affiliate, MNC International Bank ("MNCIB"), in June 1988 for real estate developer Robert K. Marceca ("Marceca") and partnerships owned or controlled by him (the "Marceca borrowers"). Referred to as the Marceca II loan, it was divided into two portions with the first having an original principal amount of $35 million and the second an original principal amount of $12.5 million. The loan's purpose was to provide the Marceca borrowers with the funds necessary to refinance, renovate and convert to condominium or cooperative use eight rent-controlled or rent-stabilized apartment buildings in Manhattan. Marceca personally guaranteed payment of principal and interest on the first mortgage component but only payment of interest on the second mortgage component. Before the Marceca II loan was made, the gross retail sellout value of the properties collateralizing the loan after conversion to cooperative ownership was estimated at $59,345,000 (the "appraisal"). The appraisal was based upon various factual assumptions, including that one hundred percent of the units would be sold at "outsider" prices.

In December 1987, prior to Marceca II, MNB had acquired a first Marceca loan, known as the Marceca I loan, from London Interstate Bank. Marceca I had an original principal amount of $50 million on which Marceca personally guaranteed payment of

---

**1.** *Banque Arabe I* dismissed claims of negligent misrepresentation, gross negligence, and breach of fiduciary duty in addition to a second breach of contract claim.

interest. The loan was secured by sixteen rent-controlled or rent-stabilized Manhattan apartment buildings. While MNB did not seek participation in the Marceca I loan, it did intend to seek the participation of other banks under the first portion of Marceca II to other banks.

Toward the end of May 1988, MNCIB officials had contacted prospective participants, including BAII, and requested commitments by mid-June.[2] Almost immediately, BAII engaged in arm's length negotiations with MNCIB and BAII vice president Maurice Nhan ("Nhan") drafted a credit analysis of the Marceca II loan, based on documents supplied to it by MNCIB officials. Included in these documents were schedules of projected principal prepayments which had been prepared by the Marceca II borrowers in June 1988 (the "June projections" or the "paydown schedules"). The Marceca borrowers advised MNB that they expected to make the projected prepayments from the conversion proceeds. The June projections were based on a number of assumptions, including, *inter alia*, that (a) the first projected repayment allocable to each building would be made at the time of the closing of the building to cooperative ownership, and (b) the closing of the conversion of each building would occur ninety days after an offering plan for the conversion of the building was accepted for filing by the New York State Department of Law (the "AG" or the "Department of Law"). In June 1988, BAII recognized that the paydown schedules were projected prepayments of the Marceca II loan, but they also understood the projections to be realistic.

In addition, to its documentary analysis of the Marceca II loan, BAII conducted a due diligence investigation. Nhan, in particular, met with Marceca at the developer's office and inquired about the eight properties collateralizing the Marceca II loan. Although an MNCIB official was present for the first ten to fifteen minutes, the balance of the hour-long meeting was a "broad conversation" between Nhan and Marceca. Nhan

Dep. at 76–77. While they discussed the real estate market in New York, the Marceca properties and Marceca's experience, Nhan did not make specific inquiry regarding renovations at any of the buildings nor did he review with Marceca any of the documents he had received from MNB. Nhan also spoke with others in the real estate business in order to familiarize himself with the cooperative and condominium conversion process in general.

Based upon its credit analysis and due diligence investigation, BAII decided to purchase a $10 million participation interest in the Marceca II loan. BAII indicated in a letter dated July 13, 1988 that it was committed to participating in the loan (the "Commitment Letter"). As a condition to its purchase of the participation interest, BAII required that the Marceca II loan be "cross collateralized," such that a portion of the proceeds from sales of units in each of the Marceca II properties be applied to pay down portions of the loan allocable to the other properties. It took approximately six weeks for MNB to obtain the Marceca borrowers' agreement to this condition. On September 29, 1988, BAII executed a participation agreement with MNB, which became effective on October 3, 1988, when the participant paid $10 million to the lead bank and, in return, received a fee of $200,000 (the "Participation Agreement"). In the Participation Agreement, BAII warranted that its participation was based on independent investigation and not as the result of documents and information supplied by the lead bank.

## B. *The Co–Sponsorship Issue*

Repayment of the Marceca II loan depended on the Marceca borrowers successfully converting the properties to cooperative ownership. As was explained in *Banque Arabe I,* in New York, a closing cannot occur until the sponsor completes a three stage process that results in the plan being declared effective by the Department of Law. The three

---

2. BAII was one of four banks to purchase participation interests in the Marceca II loan. The other three banks were the State Bank of Victoria, Banco Totta & Acores and Abu Dhabi International Bank. Altogether, the four participating banks purchased $25 million of the $35 million portion of the Marceca II loan.

stages include: (1) the "red herring" stage during which a draft plan is submitted by the sponsor to the Department of Law and to the existing tenants in the building; (2) the "black book" stage when a final plan is allowed to be filed because the Department of Law has determined there to be full and fair disclosure in the plan as well as complete regulatory and statutory approval; and (3) the "post effective" stage at which time the sponsor enters into subscription agreements with the tenants and files an amendment to the plan declaring it effective. Typically, the closing does not take place until at least ninety days after the Department of Law accepts the plan, and usually occurs later.

Conversion of the Marceca properties, in fact, was delayed, because the Department of Law raised questions concerning the sponsorship of the Marceca loans as disclosed in some of the offering documents (the "co-sponsorship issue"). In particular, MNB had not been identified as a co-sponsor, even though it had a right under the Marceca mortgages to approve the terms of the offering plans.

The co-sponsorship issue was raised prior to the execution of the Participation Agreement but subsequent to the issuance of the Commitment Letter. On August 9, 1988, the Department of Law notified Marceca of sponsorship problems in the offering plans for some of the properties and indicated that it was referring the matter to the Enforcement Division. Marceca informed MNCIB officials of the co-sponsorship issue in mid-August 1988. On August 18, R.B. Diffenderfer ("Diffenderfer"), one of the MNCIB officials administering the Marceca loans, signed a letter for submission to the Department of Law explaining that MNB was a lender and not actively involved with the conversion of the Marceca properties (the "to whom it may concern letter"). Subsequently, Diffenderfer followed the status of the co-sponsorship issue through correspondence both in writing and on the telephone with Marceca's attorney, Myron Beldock ("Beldock"). In mid-September 1988, Beldock informed Diffenderfer during a telephone call that the AG would be considering the co-sponsorship issue at a hearing scheduled for September 22 but that he expected imminent resolution. Diffenderfer memorialized this conversation in a memorandum he drafted for the Marceca file ("the September 12 memo"). In the memo, Diffenderfer related that Beldock had minimized the significance of the co-sponsorship issue.

Between July 13 and October 3, 1988, BAII did not request information regarding the status of the proposed conversions from Marceca and the Marceca borrowers because it viewed such a request as inappropriate banking practice. BAII also refrained from seeking information from the Department of Law. While it could not have discovered the existence of the co-sponsorship issue from the Department of Law, BAII could have learned about the status of the offering plans for the Marceca I and Marceca II properties. Had BAII asked the Department of Law about the status of the offering plans, the Department of Law (a) would have advised BAII whether red herrings had been submitted and for which buildings; (b) advised BAII whether red herrings submitted to the Department of Law had been accepted or rejected; and (c) made available for review and copying by BAII the red herrings submitted by the Marceca borrowers, any revised versions thereof, any supporting documentation submitted by the Marceca borrowers to the Department of Law, and any deficiency letters and other correspondence between the borrowers or their counsel and the Department of Law concerning any plans that had been rejected.

Prior to funding its participation interest, BAII had not been advised of the co-sponsorship issue by MNB. On November 10, 1988, Cynthia Buescher [Allner] ("Allner"), another MNCIB official assigned to the Marceca loans, sent a revised repayment schedule to Nhan. She indicated that payments would not begin until March 1989 instead of November 1988 because the Department of Law had failed to complete its review of one of the red herrings within the statutorily required period of six months. On January 19, 1989, Allner wrote Nhan again, disclosed the existence of the co-sponsorship issue, and explained that the co-sponsorship problem had been resolved by a modification made to the

mortgage documents (the "January 19 letter"). The modification removed Section 2.17, which had granted MNB the right to approve the terms of the offering plans submitted by the Marceca borrowers. Between January and November 1989, BAII received monthly status reports from MNB. None of these, however, revealed that MNB had knowledge of the co-sponsorship issue prior to execution of the Participation Agreement.

## C. *The Loan Default*

By the end of 1989, as a consequence of the delay caused by the co-sponsorship issue, none of the Marceca properties were converted to cooperative ownership, and the Marceca borrowers were in default on their obligations under the loan documents. The interest reserves had been exhausted and BAII received its last interest payment on December 1, 1989. During December 1989 and January 1990, MNB apprised the participants of Marceca's deteriorating financial status and began considering ways to work out the loan. Simultaneously, BAII vice president, William Waller ("Waller"), conducted a review of the Marceca transaction and requested permission to visit MNB's offices. Waller and an attorney visited BAII's offices at the end of February 1990, where they reviewed the Marceca file and discovered Diffenderfer's September 12 memo.

On March 26, 1990, MNB and Marceca executed a settlement agreement (the "Consensual Foreclosure Agreement"). It provided, among other things, that while the Marceca properties would be surrendered to MNB, the bank would make payments to the Marceca borrowers and would release Marceca from liability on his personal guarantee. MNB eventually made payments to the Marceca borrowers and charged BAII for its *pro rata* share of these payments. In April 1990, MNB brought an action to foreclose the mortgages securing the Marceca II loan. A Judgment of Foreclosure and Sale was entered in favor of MNB and against the Marceca II borrowers directing that the mortgaged properties be sold to satisfy the

mortgage indebtedness plus interest, costs, and disbursements.

In May 1991, the Marceca II properties were sold at a public auction at which MNB was the successful bidder. MNB then entered into an agreement with a real estate investor who purchased the Marceca II properties at the closing of the foreclosure sale in June 1991. The proceeds of this sale totalled $11,337,500 in the aggregate, before payment of tax and other liens entitled to priority, and costs. In July 1991, Banque Arabe received $1,843,140 from MNB as its share of the net foreclosure sale proceeds. Banque Arabe also received $176,697 from MNB as its *pro rata* share of the net rental income collected from the Marceca II properties during the pendency of the foreclosure action. Marceca filed a petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Southern District of New York, in August 1990. On May 29, 1991, Banque Arabe filed a claim in Marceca's Chapter 7 case for $10,000,000.

## D. *The Assignment*

In the early part of 1990, Banque Arabe, BAII's French parent company, decided to sell the American subsidiary and dissolve it as an entity.[3] At that time, Waller conferred with the bank's attorneys and explained that BAII sought to dispose of the vast majority of its assets by transferring them to Banque Arabe. In a memorandum dated April 27, 1990 (the "April 27 memo"), Waller identified the Marceca transaction as one of three real estate loans he would transfer first as part of his overall task of "transfer[ring] all loans and letters of credit off the books in New York and onto the books of Banque Arabe in Paris." Defendant's Ex. AA. Waller conferred with BAII's attorneys and directed them to draft an assignment for the purpose of carrying out the instructions referenced in the memorandum. On May 31, 1990, BAII executed an assignment in which it "assigned, transferred, and conveyed ... all ... rights, title and interest" in the Participation Agreement and BAII's participation in the

---

**3.** BAII was a New York State chartered bank, which was wholly owned by BAII American Holdings Corp., a Delaware corporation. The latter was, in turn, wholly owned by Banque Arabe.

Marceca II loan (the "Assignment"). Plaintiff's Ex. 81.[4]

In the middle of 1990, Waller engaged in settlement discussions with MNB. Although the other participants accepted MNB's offer to be bought out at thirty cents on the dollar, Banque Arabe determined that this offer and other settlement offers were unacceptable. On October 4, 1990, in an effort to try and recover its loss on the Marceca II loan, Banque Arabe instituted this action against MNB.

## DISCUSSION

### I. Standing

Before addressing the substantive fraud allegations, the Court must first consider whether Banque Arabe is a real party in interest and has standing to assert its claims against MNB. *Banque Arabe I* noted that, while the Assignment unquestionably transferred *contract* claims from BAII to Banque Arabe, it was unclear whether *tort* claims were transferred as well. Because the parties offered differing readings of the Assignment, the Court reserved judgment on the standing question until it received extrinsic evidence at trial concerning whether BAII intended to transfer the fraud claims to Banque Arabe.[5] MNB has the burden to prove Banque Arabe's lack of standing by a preponderance of the evidence. *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 178 A.D.2d 290, 577 N.Y.S.2d 375 (1991); *Hansen v.*

*Cauldwell–Wingate Co.*, 25 Misc.2d 857, 201 N.Y.S.2d 827, 831 (1960).

### A. New York Law Concerning the Assignment of Fraud Claims

*Banque Arabe I* explained that in New York, "an assignment of the right to assert contract claims does not automatically carry with it an assignment of the right to assert tort claims relating to the transaction which established the contract. The assignor must also transfer the cause of action for tort claims to the assignee." *Banque Arabe I*, 819 F.Supp. at 1289 (citing *Nearpark Realty Corp. v. City Investing Co.*, 112 N.Y.S.2d 816 (Sup.Ct.1952)). The Court qualified, however, that "it is not necessary for an assignment to contain specific 'boilerplate' language in order to transfer a cause of action. '[A]ny act or words are sufficient which "show an intention of transferring the chose in action to the assignee...." ' " *Id.* (quoting *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir.1976) (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (Sup.Ct.1953))).

At trial, MNB characterized the explicit assignment of fraud claims as a well-established principle of New York law that dates back to *Fox v. Hirschfeld*, 157 A.D. 364, 142 N.Y.S. 261 (1913). In *Fox*, an assignment transferring "all my right, title, and interest in and to the within contract" was held not to cover a claim for fraudulent misrepresentation because "the language employed in the assignment of the contract was not appropri-

---

4. The Assignment reads in pertinent part:
 ... as of May 31, 1990 BAII Banking Corporation ... ("Assignor") ... has sold, assigned, transferred, and conveyed, and by these presents does sell, assign, transfer and convey unto Banque Arabe et Internationale d'Investissement ... ("Assignee"), without recourse to the Assignor, all of BAII Banking Corporation's rights, title and interest in
 (a) the Participation Agreement ... and
 (b) BAII Banking Corporation's participation in a loan made by Maryland National Bank on or about June 23, 1988 ... in the original principal amount of $35,000,000.
 Plaintiff's Ex. 81.

5. According to Banque Arabe, clause (a) of the Assignment, taken alone, covered only contract claims, insofar as that clause simply provided for the assignment of "all of [BAII's] rights, title and

interest in ... the Participation Agreement." However, Banque Arabe asserted that tort claims were covered by reading clause (b) of the Assignment, which provided for the assignment of "all of [BAII's] rights, title and interest in ... [BAII's] participation in the [Marceca II loan]" together with language in the Assignment providing that the assignor sells, assigns, transfers and conveys, "all of [BAII's] rights and interests in the transaction described in Paragraphs (a) and (b) above." MNB countered that the text and structure of the Assignment clearly demonstrated that BAII did not explicitly transfer tort claims to Banque Arabe. No clause in the Assignment, MNB maintained, referred to activities giving rise to a fraud claim. Instead, the Assignment exclusively referred to rights and interests in the Participation Agreement itself. *Banque Arabe I*, 819 F.Supp. at 1289.

ate to assign a cause of action arising, not under the contract, but for the fraudulent representations of the defendant." *Id.* 142 N.Y.S. at 263. As analyzed by later New York case law, *Fox* stands for the principle that when an assignment of a contract does not explicitly assign a cause of action based upon fraud, "only the plaintiff's assignor may rescind or sue for damages for fraud and deceit; the representations were made to it and it alone had the right to rely upon them." *Nearpark Realty Corp. v. City Investing Co.,* 112 N.Y.S.2d at 117. When the Court questioned defendant's counsel at trial whether there was any more recent precedent for this principle, he cited *Fund of Funds v. King,* No. 74 Civ.1981, Fed.Sec.L.Rep. (CCH) P95,-640, 1976 WL 799 (S.D.N.Y. June 29, 1976) in which an assignment of "any and all interests" was held not to have transferred a fraud claim on account of lack of specificity.

In response, plaintiff's counsel questioned whether this principle is still good law. He asserted that it appeared to have been overruled by N.Y.Gen.Oblig.Law § 13–107, which reads in pertinent part:

> Unless expressly reserved in writing, a transfer of any *bond* shall vest in the transferee all claims or demands of the transferrer [sic], whether or not such claims or demands are known to exist, (a) for damages or rescission against the *obligor* on such bond
>
> . . . .

*Id.* (emphasis added). Claiming that the statute literally covered the Participation Agreement, plaintiff argued that, the Court would have to find that the Assignment included tort claims and dismiss defendant's affirmative defense of lack of standing.

During the defense's summation, however, defendant's counsel correctly pointed out that the Participation Agreement is not covered by § 13–107 for two reasons. First, because the participation Agreement is not a "bond" as defined by the statute. Section 13–107(2) reads: "As used in this section, 'bond' shall mean and include any and all shares and interests in an issue of bonds, notes, debentures and other evidences of indebtedness. . . ." Second, because under the provision, rescission claims must exist

against the obligor, and on the Marceca loan that would be the Marceca borrowers and not MNB.

### B. *Judge Sofaer's Approach: Freely Assignable Fraud Claims*

In a post-trial submission, plaintiff reasserted its statutory argument by referring to Judge Sofaer's decision in *ACLI Intern. Commodity Servs., Inc. v. Banque Populaire Suisse,* 609 F.Supp. 434 (S.D.N.Y.1984). According to Judge Sofaer, because "[t]he law has moved away from the limitations on free assignability . . . New York law now permits the assignment of most types of claims, including claims of fraud, and . . . the assignee of a claim should be deemed to have received the right to enforce any claim assigned." *Id.* at 441–42. As a result, *ACLI* held that even where § 13–107 could not be relied on as actual authority that any claim can be assigned, it could be used as guiding authority inasmuch as "[t]he statute reflects the legislature's willingness to presume the assignment of all claims in order to enhance felt commercial needs." *Id.* at 444. On the facts in *ACLI,* Judge Sofaer reasoned that even though "accounts receivable" were not bonds and even though the defendant bank was not an obligor, the fraud claim could be assignable under § 13–107 because "the statute should be seen to teach by example, rather than to exclude by implication." *Id.* at 443.

*ACLI* acknowledged that, while it was reading § 13–107 broadly, the statute was enacted in order to overrule New York case law involving the assignment of *bonds and other forms of commercial paper.* Judge Sofaer wrote:

> The change made in New York law by § 13–107 was designed to enable *the assignee of a bond or other similar instrument* to take all the assignor's rights in the paper assigned, and to sue the obligor directly. The operative paragraph of § 13–107 refers specifically to "bonds," not to "evidences of indebtedness." . . . The legislature apparently concluded that assignees of bonds, notes and other forms of commercial paper should be entitled to protect the value of such forms of paper by being entitled, absent an express limita-

tion, to sue the debtor, obligor, trustee, or depository on any theory available to the assignor. The statutory rule thereby simplified the assignee's task of collection and protected the value of certain forms of highly negotiable commercial paper.

*Id.* (emphasis added) (citations omitted). Indeed, the Historical Note following § 13–107 states clearly that the statute reverses the holdings in *Smith v. Continental Bank & Trust Co.*, 292 N.Y. 275, 54 N.E.2d 823 (1944) (absent express assignment, transferor of corporate bonds retains accrued causes of action for damages against trustee) and *Elias v. Clarke*, 143 F.2d 640, 644 (2d Cir.) ("under the governing New York law a claim for fraud or misrepresentation in connection with an obligation evidencing a debt, whether for damages or for rescission, does not pass merely with the transfer of the obligation itself, where there are lacking special words of assignment of the claim."), *cert. denied*, 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944). *See*, N.Y.Gen.Oblig.Law § 13–107 Historical Note.

Judge Sofaer rejects the view, however, that § 13–107 is a narrow exception to the general rule that a fraud claim must be explicitly assigned. *ACLI* maintains that this perceived "long-standing rule" never really existed. Judge Sofaer acknowledges that there are New York cases which cite *Fox* for the principle "that in the absence of an assignment of a cause of action based upon the fraud, as distinguished from an assignment of the contract ... the cause of action belongs to the assignor." *Nearpark Realty Corp. v. City Investing Co.*, 112 N.Y.S.2d at 817 (citing *Fox v. Hirschfeld*, 142 N.Y.S. at 262). Nevertheless, Judge Sofaer declares: "the 'long-standing rule' that ACLI claims was implicitly affirmed by the 'statutory exception' is in fact represented by a mere handful of cases, which fail to establish any such rule." *ACLI Intern. Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F.Supp. at 443. According to *ACLI*, *Fox* cannot be considered a landmark case because it "was a 3–2 decision based on very special circumstances." *Id.* Under *ACLI*'s interpretation of *Fox*, the assignor retained the fraud claim because the assignee was the assignor's wife and she paid nothing to her husband for the house, which was the subject of the contract. Therefore, Judge Sofaer inferred from *Fox* that:

> Had the assignee paid for the contract in an arms-length transaction before discovery of the fraud, the same court would likely have found that the cause of action passed to the assignee, absent evidence of an intention that it be retained by the assignor. In such circumstances the accrued action for fraud would be "essential to a complete and adequate enforcement of the contract, [and therefore] it passes with an assignment of the contract as an incident thereof."

*Id.* (quoting 6A C.J.S. *Assignments*, § 77, at 721 (1975)).

Absent a rule requiring explicit assignment of fraud claims, Judge Sofaer suggests that courts rely exclusively on modern contract principles in determining the scope of an assignment. *Id.* at 442. "The parties to an assignment are now free to agree by contract to virtually any form of assignment, subject to such general limitations as the principle that an assignee can receive no greater rights than the assignor possessed." *Id.* Freely assignable claims means that a fraud claim is presumptively assignable and is restricted only by "a manifestation of a different intention." *Id.* at 444.

## C. ACLI's Approach Criticized

### 1. ACLI's Erie Problem:

Based upon principles of comity and federalism, this Court cannot adopt *ACLI*'s refusal to adhere to a principle of New York law. Under the *Erie* doctrine, federal courts considering an issue of state law are bound to respect a state court judgment concerning that issue. *See, Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938).

*Erie* recognized that there should not be two conflicting systems of law controlling the primary activity of citizens, for such alternative governing authority must necessarily give rise to a debilitating uncertainty in the planning of everyday affairs.... Thus, in diversity cases *Erie*

commands that it be the state law governing primary private activity which prevails. *Hanna v. Plumer*, 380 U.S. 460, 474–75, 85 S.Ct. 1136, 1145–46, 14 L.Ed.2d 8 (1965) (Harlan, J., concurring) (footnote omitted). Indeed, in a diversity action, a federal district court acts in the role of a state court and is required to uphold the law of the state. "[S]ince a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State." *Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09, 65 S.Ct. 1464, 1469–70, 89 L.Ed. 2079 (1945). As such, this Court will follow New York State case law, that has never been overruled, in determining the method for assigning fraud claims.

### 2. *ACLI's Broad Reading of Section 13–107*

*ACLI* admittedly sweeps broadly in defining the parameters of § 13–107. However, this statute specifically refers in precise language to claims transferred with a *bond*, and it explicitly encompasses definitions of the operative terms including what is meant by a "bond." Section 13–107 is not a vague, general provision, from which a court could infer a legislative determination, or in *ACLI's* terminology "the legislature's willingness," to codify the free assignability of all claims. This Court sees no reason to look into legislative intent in any case. As the Second Circuit has recently emphasized:

> Analysis of [a] provision must commence with the language of the statute itself because, when looking at its language, a court should presume that the statute says what it means.... If the words of a statute are unambiguous, judicial inquiry should end, and the law interpreted according to the plain meaning of its words.... Only where doubt or ambiguity resides in a Congressional enactment— *i.e.*, the legislature's finished product— may legislative history and other tools of interpretation beyond a plain reading of

the statute's words be utilized to shed light on verbiage that is unclear.

*Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072–73 (2d Cir.1993) (citations omitted); *see also, Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 531 (2d Cir.1994).

Moreover, an examination of the legislative history only confirms that § 13–107 was intended to have limited applicability. The legislative history states: "[Section 13–107] provides that such causes of action pass with a transfer of the bond.... The provision for automatic transfer is limited to claims against the obligor, an indenture trustee or depositary, or a grantor." N.Y.Gen. Oblig.Law § 13–107 Historical Note (citing 1950 Leg.Doc. 65(D)). Accordingly, the Court finds that § 13–107 does not cover the automatic assignability of claims relating to the Participation Agreement, even in the guise of "guiding authority."

### 3. *ACLI's Misinterpretation of Fox v. Hirschfeld*

█ This Court also disagrees with *ACLI's* interpretation of *Fox v. Hirschfeld* and the contention that New York law no longer holds that fraud claims must be specifically assigned. *Fox* makes clear that it was not the circumstances surrounding the contract, "but the *language* employed in the assignment of the contract," which made the fraud claim not assignable. *Fox v. Hirschfeld*, 142 N.Y.S. at 264 (emphasis added). No subsequent New York case law has understood *Fox* any differently. *See, e.g., Weylin Hotel Corp. v. Ritter*, 114 N.Y.S.2d 158, 159 (Sup.Ct.1952) ("The rule seems well established that the assignee of the original contract ... may not sue the vendor for fraud [for] allegedly inducing the contract."). In short, this Court adopts the holding of *Fox v. Hirschfeld* and its progeny that the assignment of a contract does not automatically transfer related tort claims.

### D. *Analysis of the BAII Assignment*

The Court now examines whether the language of the assignment effectively transferred the fraud claim. In *ACLI*, the assignment included language that "all rights,

claims and causes of action" would be transferred. The court found that the language reflected an intention to transfer the fraud claim. *ACLI Intern. Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F.Supp. at 444. However, because the assignment specified that the transferred claims could only be brought against "debtors" or "owners," the court also found that they could not be brought by the assignee against unspecified third parties, such as the defendant. *Id.* In addition, the court relied on the testimony of principal officers of the assignor that they did not intend to assign the fraud claims with respect to the defendant. *Id.* at 445.

The instant action provides the reverse situation. While the language itself appears not to cover tort claims, Banque Arabe and BAII officials maintain that they intended to transfer all claims and causes of action associated with the Participation Agreement through the Assignment. Alasdaire Hewett ("Hewett"), a Banque Arabe official, testified that through the assignment Banque Arabe "intended to acquire all the rights, remedies, courses [sic] of action whatsoever that BAII banking Corp. may have had. In other words, which [sic] were putting ourselves in their shoes." Trial Tr. at 704. Waller explained that, in instructing BAII's attorneys on how to draft the assignment, he had made it clear that "our mission was to remove from BAII Banking Corporation the vast majority of its assets and transfer them to . . . Banque Arabe, and in particular, we wished to transfer the Marceca transaction . . . I asked him to prepare appropriate assignment documents to accomplish that, including any and all rights and remedies that might go with it." *Id.* at 868.

However, neither Waller nor Hewett testified that BAII and Banque Arabe specifically and consciously agreed to a transfer of tort claims. In fact, Waller confirmed that the assignment agreement was simply the transfer document necessary to transfer the Marceca loan to Banque Arabe. Trial Tr. at 297. Waller's April 27 memo evidences that the assignment of the Marceca loan was part of a general transfer of participation agreements and it refrained from specifying that

any claims or causes of action were being assigned along with it.

■ Had BAII wished to assign litigation claims associated with the Marceca transaction, it knew how to effectuate such a transfer. On April 10, 1992, BAII entered into an assignment agreement with BAII American Holding Corp. in which it assigned litigation claims arising from the Will Petroleum accounts. This assignment contained a provision which read in pertinent part: "The Liquidating Bank hereby grants, assigns and conveys unto Holding all *claims*, accounts, *actions*, debts, *causes of action* and rights to pursue recovery of all sums. . . ." Defendant's Ex. FF. at 3 (emphasis added). Banque Arabe argues that the Will Petroleum assignment is different than the MNB assignment because it referred to actions already commenced. In the instant case, on the other hand, no actions had been commenced at the time the Assignment was executed. Banque Arabe's argument only confirms that the Assignment did not cover the fraud claim. Similar to the Will Petroleum litigation, once BAII decided to institute an action for fraud against MNB, it could have executed an assignment transferring the claim to Banque Arabe. Moreover, by May 31, 1990, when the Assignment was executed, plaintiff was aware of potential claims later asserted against MNB in this action. Trial Tr. at 778 (citing Plaintiff's Response to Request for Admission No. 118). Therefore, even though New York requires no specific language in order to effectuate a transfer of claims, the language selected by BAII for the Marceca Assignment, as opposed to the language employed for other assignments, clearly demonstrates that it did not intend through the Assignment to explicitly include fraud claims in the transfer. Accordingly, the Court finds that Banque Arabe lacks standing to assert a fraud claim.

II. *Rescission*

A. *Promptness*

■ Over a century ago, the Supreme Court explained that, "[w]here a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and

adhere to it.... He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." *Grymes v. Sanders,* 93 U.S. 55, 62, 23 L.Ed. 798 (1876). As a result, a plaintiff is required to assert his right to rescind without unreasonable delay. *Allen v. Westpoint–Pepperell, Inc.,* 945 F.2d 40, 47 (2nd Cir. 1991). Rescission claims must be instituted "promptly after discovery of the fraud." *Gannett Co., Inc. v. Register Pub. Co.,* 428 F.Supp. 818, 827 (D.Conn.1977). Promptness is an element of a *prima facie* rescission action and the burden of proof is on plaintiff. *Johns Hopkins University v. Hutton,* 488 F.2d 912, 916 n. 12 (4th Cir.1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *see also,* John M. Friedman, "Delay as a Bar to Rescission," 26 *Cornell L. Quarterly* 426, 428–29 (April 1941) [hereinafter Friedman] ("in rescission actions, it is incumbent upon the plaintiff to prove that he acted promptly in seeking his rescission.").[6]

The principle of promptness is a fairly stringent requirement. *Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970). Even where a party does not have full knowledge of fraud, he can be held to have been delinquent in raising the rescission claim. A party must assert his right to rescind after having had notice of the fraud and the opportunity to investigate.

"Full and complete knowledge of an alleged fraud or breach of contract is not essential to impose upon a would-be rescinder the necessity of acting promptly and diligently if he wishes to assert a rescission. It is enough that he has such notice of the facts as would impel a reasonable man in his position to make inquiry. Having such notice, he will be chargeable with knowledge of all the facts which inquiry would disclose."

Friedman at 432, *quoted in Johns Hopkins University v. Hutton,* 488 F.2d at 917. The Court notes, however, that the party need not raise the claim *immediately* upon notice of the fraud but is afforded a reasonable

period after notice of the fraud within which to consider whether or not to rescind. Friedman at 449. "'Reasonable time is inceptive from the receipt by the rescinder of wor[d] putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. If the quest confirms this suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.'" *Gannett Co., Inc. v. Register Pub. Co.,* 428 F.Supp. at 828 (quoting *Baumel v. Rosen,* 412 F.2d at 574). In addition, there are events and excuses which can suspend the delay period. For example, where the parties are seeking settlement or compromise, rescission need not be asserted until the negotiations fail. Friedman at 452.

MNB alleges that Banque Arabe was not prompt in asserting rescission because it had sufficient knowledge of possible fraud by March of 1990 and it waited until October of that year before filing its claim. Defendant contends that, at the very latest, BAII learned of MNB's pre-funding knowledge in late February 1990 when Waller visited MNB's offices and saw Diffenderfer's September 12 memo. On the other hand, Banque Arabe argues that, even if it did have the requisite amount of knowledge in March 1990, it refrained from asserting its right to rescind until after settlement negotiations finally broke down in September 1990.

The Court agrees with defendant that BAII had sufficient notice of fraud by the time Waller discovered Diffenderfer's September 12 memo. The memo states clearly and unambiguously "The bank was first made aware of th[e co-sponsorship] issue by Bob Marceca in mid-August." Plaintiff's Ex. 36. Banque Arabe asserts that upon discovery of this memo, it directly questioned MNB as to time and scope of that bank's knowledge concerning the co-sponsorship issue. Waller wrote MNB on March 23, 1990 requesting information including:

What was Maryland National Bank's role in resolving the New York Attorney General's concerns over the Bank's status as a

---

6. The promptness requirement is not the same as the equitable doctrine of laches. While laches is a delay that works to the disadvantage of another, prejudice is not an element of the promptness requirement. Friedman at 428.

co-sponsor of the Marceca Offering Plans? When did Maryland National Bank first learn about the Attorney General's concerns? When did the bank first conclude that these schedules would delay the original paydown schedule for the Marceca II loan, as described in R.B. Diffendorfer's [sic] September 12, 1988 memorandum? How was the paydown schedule modified as a result of that conclusion?

Plaintiff's Ex. 91. As part of its response, on March 29, 1990, MNB stated that "[t]he Attorney General's purported concern was first learned of *in early fall 1988.*" *Id.* Ex. 92 (emphasis added). This response, Banque Arabe maintains, was, at best, misleading, and thus, even by the end of March, BAII should still not be viewed as having had notice of the alleged fraud.

Banque Arabe's argument fails because it elevates the significance of the "early fall 1988" response and ignores the impact of Waller's discovering the September 12 memo. In the first part of 1990, BAII's relationship with MNB was becoming increasingly more adversarial. Indeed, by the end of January 1990, Waller had been contemplating legal action against MNB. In a memo he drafted on January 25, 1990, Waller wrote:

> There are aspects of the entire transaction which could perhaps provide BAII with possible causes of action against Maryland National Bank.... In the ideal situation, the attorneys will uncover a clear piece of factual evidence which indicates that Maryland National has behaved improperly. Unfortunately, the more likely outcome is that there is no such clear evidence and that, at best, we have murky evidence of negligence and incompetence on the part of Maryland National Bank rather than actual wrongdoing....

Defendant's Ex. AA at 17. The September 12 memo was sufficient for what Waller needed. BAII now had an internal memorandum from MNB's files identifying a fairly precise date at which the lead bank had knowledge of the co-sponsorship issue. Such documentary evidence is far more probative than the vague response of a potential adversary. Thus, the Court finds that BAII had

notice of facts supporting a fraud claim by, at the latest, the end of February 1990. Its decision to rescind had to be made sometime soon after it conducted its March inquiry.

Nevertheless, the Court also finds that Banque Arabe cannot be held to have failed to assert its claim promptly, because of the settlement negotiations. Although the evidence at trial did not pinpoint the exact date at which settlement negotiations ended, it appears that they ceased in or around September 1990. The Court holds that plaintiff's assertion of its rescission claim within a month of the time the promptness requirement commenced was reasonable.

### B. *Ratification*

█ Rescission is a remedy through which a party seeks to disaffirm the contract and return to the status that existed before the transaction was executed. *Soderberg v. Gens,* 652 F.Supp. 560, 565 (N.D.Ill.1987). Where a party engages in acts inconsistent with disaffirmance, such as acceptance of benefits under the contract or the exercise of dominion over the subject matter of the transaction, he will lose the right to rescind. *Gannett Co., Inc. v. Register Pub. Co.,* 428 F.Supp. at 824, 826. Reaffirming acts are frequently characterized as a ratification of the contract. " 'Ratification' results where a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in [a] contract for any considerable length of time after he has opportunity to annul or void the contract." *Prudential Ins. Co. v. BMC Industries,* 630 F.Supp. 1298, 1300 (S.D.N.Y.1986). By ratifying a contract, the party waives the right to rescind. *Vista Co. v. Columbia Pictures Industries, Inc.,* 725 F.Supp. 1286, 1295 (S.D.N.Y.1989). Waiver involves "intentional relinquishment of a known right" and must contain both "knowledge of its existence" as well as the "intention to relinquish it." *City of New York v. State,* 40 N.Y.2d 659, 389 N.Y.S.2d 332, 340, 357 N.E.2d 988, 995 (1976).

█ Ratification should not be confused with the promptness requirement. "The rule requiring promptness ... must be distinguished from the rule that intentional acts,

performed in recognition of a contract as valid, result in a ratification of a previously voidable contract and bar rescission." Friedman at 427. Unlike plaintiff's burden to demonstrate promptness, ratification is an affirmative defense and the burden of proof belongs to defendant. A party can lose the right to rescind even unintentionally. It could be that "[t]he party has simply sat back after knowledge of the facts, through indifference, negligence, or a speculative desire to see how things will turn out, and then, after what the court finds to be an unreasonable time, manifests his election to rescind." *Id.* at 430. Ratification, on the other hand, must be intentional. *Id.*

Nevertheless, MNB asserts that the knowledge level for establishing promptness is the same for determining ratification. Defendant simply cites the principle applicable to the promptness requirement, as noted above, that a would-be rescinder need not have full knowledge of the fraud, but notice of facts which, in the exercise of due diligence, would lead to knowledge of the fraud. Banque Arabe counters that full knowledge of the fraud is required before there can be ratification of a contract. Its argument, however, relies on case law relating specifically to the doctrine of ratification under agency law.

In agency law, " '[r]atification is a form of subsequent authorization [where]. . . . If a principal[,] with such knowledge that there is an agreement outstanding and with knowledge of what that agreement is, then accepts the benefits of an agent's action, the principal is responsible for agreement of the agent whether originally authorized or not.' " *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F.Supp. 748, 751–52 (S.D.N.Y.1968) (quoting Judge's Charge to the Jury). To ratify the unauthorized act of an agent, a principal must have full and complete knowledge of all the material facts of the transaction. *Cooperative Agricole Groupement de Producteurs Bovins de L'Quest v. Banesto Banking Corp.*, No. 86 Civ. 8921, 1989 WL 82454 at *16–17 (S.D.N.Y.1989) (citing cases) ("ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating

an intention to adopt the unauthorized arrangement."), *aff'd*, 904 F.2d 35 (2d Cir.1990).

■ Actual knowledge is required in the agency context, because the underlying issue is whether the principal has authorized the agent to perform acts or enter into contracts, not whether the agent, himself, assumed those responsibilities. Ratification is a form of retroactive authority. Without knowing ratification, the agent's act is unauthorized and the principal is not obligated to perform. Outside of the agent-principal relationship, in contrast, ratification is not a form of authorization. It is, instead, an expression of willingness on the part of a party to a contract to abide by its terms, even after it has enough information upon which to exercise its right to disaffirm the existence of the contract. Rescission is a radical measure and a would-be rescinder should be careful not to affirm the contract once he had opportunity to consider a suspicion of fraud. Therefore, even though the standards for ratification are not the same as the requirements for asserting a rescission claim promptly, the Court finds that full knowledge is not necessary before there can be ratification. Ratification can occur even after a party has had notice of facts that would invite reasonable inquiry.

MNB cites to four acts which, it argues, demonstrate BAII's intention to continue with the Participation Agreement, even after having been put on notice of circumstances giving rise to a fraud claim. These four are as follows: (1) the acceptance of monthly interest payments between February and December 1989; (2) the assignment of the Participation Agreement on May 31, 1990; (3) the acceptance of the proceeds of the foreclosure sale in the summer of 1991; and (4) the assertion of a claim against Marceca in the developer's bankruptcy proceeding on May 29, 1991. Banque Arabe asserts that each of these acts is merely a step that a reasonable participant would take in the course of pursuing a rescission claim, and they do not constitute ratification.

### 1. *The Interest Payments*

Between October 1988 and December 1989, BAII received interest payments from Marceca through MNB. If the Court deter-

mines that BAII learned of MNB's pre-funding knowledge at any point during this time period, it could find that the participating bank accepted benefits under the Participation Agreement and waived the rescission claim. MNB argues that BAII was on notice of an alleged fraud from the time it received Allner's January 19, 1989 letter disclosing the existence of the co-sponsorship issue.

■ The Court rejects defendant's argument. MNB's pre-funding knowledge could not have been determined by BAII from Allner's January 19 letter. The letter notified BAII of problems associated with the Marceca II loan, but it did not arouse suspicion of possible pre-funding knowledge on the part of MNB. In fact, Waller testified that, because the letter also explained that the problems had been resolved by the mortgage modifications, BAII assumed that MNB had discovered the co-sponsorship issue only after the participation had been funded in the brief period leading up to the modification agreement. Trial Tr. at 270. In addition, the monthly status reports BAII received from MNB, during the period from January through November 1989, contained no information concerning MNB's pre-funding knowledge of the co-sponsorship issue. Defendant's Exs. F–N. According to Waller, BAII "had no reason to suspect or distrust" MNB until early 1990 when it became "[un-]happy with how Maryland National was pursuing the workout of its loans," and it "had a growing sense of unease about the entire situation." Trial Tr. at 271–72. Thus, the Court finds that MNB has failed to show by a preponderance of the evidence that BAII had enough information to be on notice of a fraud claim before the interest payments stopped in December 1989.

### 2. *The Assignment*

■ MNB relies primarily on *Soderberg* in arguing that an assignment operates as an affirmance of a contract extinguishing the right to rescission. *Soderberg* was a securities case, and it concluded, based on the securities context, that rescission claims can virtually never be assigned. The court reasoned that, where a party has exercised dominion over the subject matter of the transaction, it has engaged in acts "inconsistent with disaffirmance of the transaction." *Soderberg v. Gens*, 652 F.Supp. at 565. In a securities transaction, *Soderberg* explained, a purchaser could not sell the security without exercising dominion over it, and therefore when the purchaser transfers both the security and the action, he would no longer have a right to rescind. *Id.*[7]

The instant action differs from *Soderberg* inasmuch as the alleged act of disaffirmance was not the exercise of dominion over the subject matter of the transaction, but the acceptance of benefits under the contract. In essence, MNB has argued that BAII benefitted from the Participation Agreement once the contract was assigned to Banque Arabe, and, therefore, it should be held to have ratified the contract and waived the rescission claim. The Court, however, does not view the transfer of assets without consideration from a subsidiary to a parent as the acceptance of a benefit. As Waller testified, the transfer was executed at net book value with no gain or loss and with no change on BAII's balance sheet. Trial Tr. at 288.

Moreover, as this Court already determined in finding that Banque Arabe lacks standing, the Assignment was not effectuated to pursue litigation claims but, instead, simply to maintain the Participation Agreement. An attempt to preserve the status quo in the face of a suspected fraud does not amount to reaffirmation of a contract. *MacTaggart v. Risucci*, 85 Civ. 0182, slip op. at 3, 1985 WL 3343 (S.D.N.Y.1985). Because at the time of the Assignment, BAII was still negotiating

---

7. Generally, the only possible scenario in which a rescission claim is assignable occurs when the claim is transferred incident to or in connection with the transfer of the underlying property. However, "a mere naked right to rescind a voidable transaction or to sue for rescission is not assignable." 6 AmJur.2d *Assignments* § 31 (1963). This is so, as *Soderberg* suggests, because the right to rescind alone is a personal right and not a property right. On the other hand, when the right is attendant to the transfer of the underlying subject matter, it ceases to be personal and becomes a transferable property right. 6A C.J.S. *Assignments* § 35 (1975). As a result, *Soderberg* determined: "Because of the equitable and personal character of the right to sue for rescission, claims for rescission are ordinarily not assignable." *Soderberg v. Gens*, 652 F.Supp. at 565.

with MNB to have the lead bank buy back the participation interest at a discount, this Court finds that the Assignment itself was not a ratifying act.

### 3. The Acceptance of Foreclosure Proceeds

Up to this point, the Court has considered alleged acts of ratification that BAII took prior to the complaint in this action being filed. Now the Court turns to acts that occurred after this action was instituted. MNB argues that Banque Arabe is precluded from bringing a rescission claim because it reaffirmed the contract in July 1991, when it accepted its *pro rata* share of the consensual foreclosure sale along with its share of the net rental income collected during the pendency of the foreclosure action.

 However, the formal pleading of a rescission claim eliminates any implication of a subsequent ratification. *Prudential Ins. Co. v. BMC Industries*, 630 F.Supp. at 1302. In *Prudential*, Judge Sweet explained that once a party has filed suit for rescission, he has made an unambiguous request to have the contract voided, and the acceptance of payments do not negate his intent to disaffirm the contract. *Id.* Judge Sweet noted that, especially where plaintiff would be entitled to at least as much relief at the close of trial, "acceptance of payments *after* commencement of a suit for rescission cannot be deemed a ratification." *Id.* (emphasis in original). In this action, Banque Arabe accepted the consensual foreclosure payments as a way to mitigate damages, and the money it collected would eventually be credited against any remedy it would receive after trial. Accordingly, MNB has failed to prove ratification based on Banque Arabe's acceptance of consensual foreclosure payments.

### 4. Claims Against Marceca in the Bankruptcy Proceeding

 Finally, MNB contends that Banque Arabe committed an act of ratification when, in May 1991, it asserted a claim in Marceca's bankruptcy proceeding that concerned rights and entitlements under the Participation Agreement. According to MNB, the asserted claim clearly demonstrates that Banque

Arabe was reacknowledging the Participation Agreement, because if the agreement were to be rescinded, it would not be able to recover monies directly from Marceca.

Nevertheless, the Court does not consider the asserted claim as an act inconsistent with disaffirmance, but rather another effort on the part of Banque Arabe to mitigate its loss. Indeed in the proof of claim it submitted to the Bankruptcy Court, Banque Arabe stated: "By submitting this claim, claimant does not waive any rights it has against Maryland National Bank." Defendant's Ex. VV. Therefore, because plaintiff did not intend to ratify the Participation Agreement by asserting a claim in Marceca's bankruptcy proceeding, the Court finds that the asserted claim did not constitute a ratification. In sum, defendant has failed to prove by a preponderance of the evidence that BAII and Banque Arabe waived the right to rescission by engaging in acts that amount to a ratification of the Participation Agreement.

### III. Fraud

 Although this Court finds that Banque Arabe lacks standing to assert a fraud claim, it will consider the merits of plaintiff's claim. When alleging common law fraud, a plaintiff must show that: (1) there was a material false representation or omission of an existing fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance, and (5) that causes damage to the plaintiff. *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir.1993) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir. 1992)). In addition, where a plaintiff alleges that a defendant fraudulently concealed material information, he must establish that the defendant owed him a duty to disclose. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir.1993). Under New York law, each element of a fraud claim must be proved by clear and convincing evidence. *Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir.1988) (citing *Hutt v. Lumbermens Mutual Casualty Co.*, 95 A.D.2d 255, 466 N.Y.S.2d 28 (1983)); *Simcuski v.*

**1216**

*Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 718 (1978).[8]

Banque Arabe alleges that MNB made material omissions and misrepresentations in August and September of 1988, prior to BAII's funding the participation interest. Specifically, plaintiff contends that, during that time period, MNB: (1) concealed from BAII that the Department of Law had delayed approval of the Marceca offering plans on account of the co-sponsorship issue; (2) failed to disclose to BAII that the paydown schedules provided to the participants in June 1988 were no longer accurate; and (3) affirmatively misrepresented to BAII that the transaction was "proceeding normally" and was "on schedule."

■ At the outset, the Court dismisses the affirmative misrepresentation allegation. Nhan testified that some time after the Commitment Letter, Diffenderfer indicated to him that the transaction "[g]enerally speaking . . . was as planned. It was business as usual. Things were proceeding normally." Nhan Dep. at 35. At trial, this testimony was never corroborated by Banque Arabe and Diffenderfer did not acknowledge making such statements. Therefore, the Court finds that Banque Arabe has offered insufficient evidence, certainly not clear and convincing evidence, to support the allegation of affirmative misrepresentations on the part of MNB. The Court now focuses on the alleged omissions.

### A. The Duty to Disclose

■ In *Banque Arabe I*, this Court determined that MNB "had a duty to disclose to BAII the delay in the Department of Law

approval and the reasons for the delay," even though BAII warranted in the Participation Agreement that it had made its decision to participate independently and without reliance on the originating bank. *Banque Arabe I*, 819 F.Supp. at 1292. The Court explained that under New York law, a duty to speak arises when a party " ' "possesses superior knowledge, not readily available to the other." ' " *Id.* at 1290 (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984))). Similarly, even where a party expressly disclaims reliance on the other party, the disclaimer will not be given effect if the facts are "peculiarly within the knowledge" of the other party. *Id.* at 1292 (citing *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672, 677 (1991)). Relying on stipulated facts submitted exclusively for the purposes of the motion for summary judgment, *Banque Arabe I* determined that knowledge of the co-sponsorship issue and the attendant delays was not readily available to BAII, and that, because BAII could not learn about this information from the Department of Law or the Marceca borrowers, the information was peculiarly within the knowledge of MNB.

Based on the revised stipulated facts submitted together with the pre-trial order and the evidence offered at trial, the Court deems it necessary to clarify the scope of MNB's duty. Clearly, MNB had to relay to BAII the existence of the co-sponsorship issue. BAII could not have learned of this information from the Department of Law, which does not comment publicly on a matter referred to the Enforcement Division. Even

8. Plaintiff argues that recent case law supports the view that fraud need only be proved by a preponderance of the evidence standard. This Court disagrees. In *Leucadia*, the Second Circuit explicitly distinguished the standard of proof for fraud from that required for other acts involving moral turpitude. It wrote: "New York law does not, however, consider the words fraud and dishonesty to be synonymous. Dishonesty is broader and may cover acts which fall short of constituting fraud. The evidentiary standards for acts that involve moral turpitude but not fraud is the preponderance of the evidence." *Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d at 972 (citing *Aetna Cas. & Sur. Co. v. Glass*, 75 A.D.2d 786, 428 N.Y.S.2d 246, 247 (1980)). However, fraud must be proved under the clear and convincing evidence standard. *Id.* at 971.

The standard of proof for common law fraud is also different than the standard required for fraud claims brought under § 10(b) of the Securities Exchange Act of 1934. "[Al]though common-law fraud action[s] must be prove[d] by clear and convincing evidence, § 10(b) claim[s] may be prove[d] by a preponderance of the evidence." *Ceres Partners v. Gel Associates*, 918 F.2d 349, 358 (2d Cir.1990) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 388–90, 103 S.Ct. 683, 690–92, 74 L.Ed.2d 548 (1983)).

more definitely, BAII could not have received this information through communication with Marceca. Banking practice dictates that a participating bank is supposed to deal with the lead bank, with whom there is a contractual and fiduciary relationship, and rely on it for information from the borrower. *See*, D. Edwin Schmelzer & Robert P. Chamness, American Bankers Association, *A Banker's Guide to Loan Participation*, III–7 (1986) [hereinafter Loan Participation] ("In its capacity as servicing agent on the loan, the lead bank should keep the participating bank apprised of the status of the loan.... The lead bank should promptly notify the participating bank if the lead bank learns of any change in the financial condition of the borrower."). Testifying as to his bank's adherence to this practice, Anthony Bucci ("Bucci"), Senior Vice President and Chief Credit Officer at BAII in 1988, stated, "[i]nformation is normally supplied by the agent and through the agent. It would be very, very inappropriate for a participant bank to do independent credit checking ..." Trial tr. at 91. Accordingly, inasmuch as information regarding the co-sponsorship issue was not readily available to BAII and was peculiarly within MNB's knowledge, the lead bank had a duty to disclose that information to the participant.

In contrast, trial testimony revealed that, by August and September of 1988, the invalidity of the June projections was readily available to BAII and not peculiarly within the knowledge of MNB. Although BAII could not have acquired this information from Marceca, it could have discovered the delay in the conversion process simply by asking the Department of Law some relatively simple questions. MNB's expert in matters of coop conversion and real estate finance, Paul Restaino ("Restaino"), demonstrated at trial how BAII could have deduced that the projections were no longer valid. Restaino explained that BAII would not have been allowed to ask the Department of Law directly whether there had been a delay, but it could have obtained the information by asking a series of indirect questions as follows:

> You can call the Attorney General's office, ask to be referred to the Real Estate Finance Bureau, tell them that you are interested in inquiring about the status of a proposed offering plan, or the status of a converted building, and they will ... answer at least the minimum questions, such as: Is there a red herring that has been submitted? Has the building been converted? And is the Plan, if it has been converted, ... a current one from which sales can be made?
>
> In my experience, sometimes one is able to get additional, more detailed information. But at a bare minimum that information is readily provided by the Attorney General, because he views all of these conversions as a sale to the public....

*Id.* at 817. Such basic research would not have entailed the *60 Minutes*-style investigation *Banque Arabe I* exempted BAII from having to make. A reasonably prudent participant is not absolved from engaging in surface inquiry of matters relevant to repayment, when such inquiry would not contravene the parameters of a participation arrangement. Consequently, the Court holds that MNB did not have a duty to disclose to BAII that the June projections were invalid.

**B.** *Materiality*

■ Omitted information is material if it "would have assumed actual significance in the deliberations of the reasonable [purchaser]." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Material information is the type that " 'go[es] to the essential factual essence of the transaction.' " *Cresswell v. Sullivan & Cromwell*, 704 F.Supp. 392, 408 (S.D.N.Y.1989) (quoting *Benz v. Kaderbeck*, 241 App.Div. 583, 272 N.Y.S. 558, 561 (1934)), *aff'd in part, vacated in part on other grounds*, 922 F.2d 60 (2d Cir.1990), *aff'd*, 962 F.2d 2 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992). Thus, MNB's omissions would be material if they significantly affected BAII's reasonable decisions with respect to funding the participation. According to banking industry standards, such information would be what the lead bank determines to "ha[ve] a bearing on the participating bank's expectations of repayment." Loan Participation at

III-7. Most noticeably, the lead bank should consider information regarding the financial condition of the borrower as material to the participant. *Id.*

### 1. *The June Projections*

Even were this Court to have determined that MNB should have disclosed to BAII that the June Projections were no longer valid, the omission would not have been material. In June 1988, BAII believed that the paydown schedules were realistic, but it also recognized that they were simply *projected* prepayments of the Marceca II loan.[9] At trial, witnesses on both sides downplayed the significance of the June projections. Bucci testified that "in terms of timing, like any projection, it's just that, it's a projection. It's not anything that was cast in concrete or material, [it was not] overly material to the decision." Trial Tr. 97. Diffenderfer testified that his bank's "understanding was that these [paydown schedules] were projections and that they were subject to revisions." *Id.* at 365. He added that "my experience was that very few original projections ended up being ... strictly in line with what the original projections stated." *Id.*

Pursuant to the loan agreement, in fact, repayment of the principal need not have been made until five years after the loan was extended. If the paydown schedules offered in the June projections were met, the mortgages would have been repaid in advance of the maturity date. The borrower, however, was under no requirement to make prepayments of principal, and the June projections were offered simply to reassure the participant that the principal would be repaid within the five year period. BAII itself understood that the June projections would not be adhered to rigidly. Nhan testified that, when the participation Agreement was executed, he believed no red herrings had been submitted to the Department of Law for the

Marceca II properties. Nhan Dep. at 248–49. Without any red herrings, conversion of the properties would have been delayed beyond the dates provided in the June projections. Nhan recognized this fact, because in a September 29, 1988 transmittal letter sent together with signed copies of the Participation Agreement, he requested updated schedules from Diffenderfer. Plaintiff's Ex. 43. It is clear to this Court that both parties understood that the June projections were, as Bucci stated, estimates and not material to BAII's decision whether or not to enter into the loan.

### 2. *The Co–Sponsorship Information*

MNB contends that the co-sponsorship information was immaterial for two reasons. First, because the Department of Law appeared only to raise questions concerning the Marceca I and not the Marceca II properties. Second, because during August and September 1988, Beldock and Marceca's other lawyers led MNB to believe that the issue was not significant.

Diffenderfer testified that, when Marceca notified him about the co-sponsorship issue in mid-August 1988, the real estate developer stated that the problem only applied to certain Marceca I properties. *Id.* at 397. Thus, in his to whom it may concern letter, Diffenderfer only referenced four Marceca I properties and discussed the effect the co-sponsorship issue had on the Marceca I loan. This argument fails to acknowledge, however, that the language in the underlying loan documents as well as the disclosures in the red herrings concerning MNB's role were virtually identical for both transactions. More importantly, any delay in Marceca I would certainly spill over into Marceca II. Diffenderfer indicated as such when he wrote in the September 12 memo that concern over a delay applied to "both Marceca transac-

---

**9.** The Court notes that in *Banque Arabe I*, it stated: "MNCIB knew that BAII ... would rely on [the June projections] in deciding whether to purchase a participation interest in the loan." *Banque Arabe I*, 819 F.Supp. at 1285. This statement, however, was based on the original stipulated facts and was changed by the newer, revised version which reads: "Based upon its due diligence investigation and its own credit analy-

sis (including reliance on the projected paydown schedules provided to it by MNCIB), BAII decided to purchase a $10 million participation interest in the Marceca II loan." Stipulated Facts ¶ 31. Moreover, evidence at trial focused on the extent to which BAII actually did rely and should have relied on these projections. *See, infra,* discussion on the element of reliance.

tions." Plaintiff's Ex. 36. MNB's assertion that the co-sponsorship issue seemed only to apply to Marceca I and not Marceca II is a distinction without a difference and should not have been a factor in its decision whether or not the information was material.

### (a) *MNB's Correspondence with Marceca*

The more crucial question is whether MNB was correct in deciding that the co-sponsorship issue was not material based on the information it was receiving from Marceca and his attorneys. When asked, at trial, whether Marceca appeared concerned about the co-sponsorship issue during the mid-August telephone conversation, Diffenderfer replied, "No. On the contrary, he said he was not concerned." *Id.* at 388–89. Based on the conversation, Diffenderfer regarded the co-sponsorship issue as insignificant. He testified: "At the time, I believed it was an issue relating to a simple disclosure of Maryland National Bank as a lender or as a co-sponsor pursuant to their loan documents in the plan." *Id.* at 392.

Similarly, Diffenderfer was unconcerned about the co-sponsorship issue after his mid-September telephone conversation with Beldock. This was the discussion in which Beldock informed Diffenderfer of the Department of Law hearing. In the September 12 memo recording this conversation, Diffenderfer states: "Mr. Marceca's counsel believes the Attorney General's office to be incorrect in its position ... it appears that the Attorney General will not pursue the co-sponsor interpretation." Plaintiff's Ex. 36. Concluding the memo, he asserts: "The writer is confident that Mr. Marceca and his counsel are vigorously pursuing this issue and taking appropriate steps to expedite the Attorney General's response. While a delay is inevitable in the original paydown schedule, the paydown scheduled for ... the year end should not be affected." *Id.* Indeed, Beldock confirmed at trial that in his discussion with Diffenderfer, he explained that, based on research, the AG was wrong as a matter of law. Trial Tr. at 741. Beldock testified: "We thought that the Attorney General was raising an issue that was reaching out and was unusual. We certainly couldn't find any-

thing that supported the Attorney General's position in our research." *Id.* at 742.

Subsequent to the hearing, Diffenderfer again spoke with Beldock over the telephone. In relating the substance of this conversation, Diffenderfer stated: "My general recollection is that, once again, Myron Beldock stated that he felt that the issue was on Marceca's side and that the AG was being overly aggressive, but he felt as if the resolution was going to be closely [sic] in hand." *Id.* at 410. During the conversation with Beldock, Diffenderfer took notes, which he later typed up as a memorandum dated September 23, 1988. Plaintiff's Ex. 42. In this memo, Diffenderfer wrote in pertinent part:

> ... It was Mr. Beldock's judgment that the Attorney General is "thrashing around" with little justification in his actions. His attitude was that the A.G.'s office may be overreaching in its efforts to make sure the Offering Plans comply with the New York State law. He felt positive about the overall prospects of the Offering Plans going beyond this point with the Attorney General's office.... Mr. Beldock feels that Bob Marceca is on solid ground with his case and that this holdup should be temporary. When questioned about how long the A.G. may proceed to hold up the Offering Plans, Mr. Beldock indicated that it could possibly hold Bob Marceca up for another couple of weeks.....

*Id.*

In addition, Diffenderfer testified that, after this second conversation, he received a letter from Beldock dated September 21, 1988 in which the attorney explained the circumstances giving rise to the AG's proceeding. Plaintiff's Ex. 39. After describing the co-sponsorship issue, Beldock wrote: "We will urge that the restrictive language which the bank required does not transform a lender into a sponsor.... [We] are of the opinion that we have sound positions and that the Attorney General's questions are misconceived." *Id.* Diffenderfer testified that, as a result of this letter and the conversations he had with Beldock, he "had a low level of concern" at the end of September 1988 regarding the co-sponsorship issue.

Trial Tr. at 412. He was not concerned about a delay because he believed the conversion process would be underway by the end of the year and he considered only a delay of six months to a year as material. *Id.* at 414.

### (b) *Analysis*

Notwithstanding Marceca and Beldock's lack of concern, Diffenderfer and MNB should have considered the co-sponsorship issue material to BAII's expectation of repayment at some point prior to funding. Implicit within the co-sponsorship issue was the question of Marceca's creditworthiness. The longer the Department of Law delayed approval, the greater the chance Marceca would be unable to meet his repayments. Unquestionably, as time elapsed and the issue was still not resolved, MNB must have realized that the issue of repayment grew ever more important. As a lead bank in a participation loan, it had a duty to recognize the importance repayment would have for a participating bank as well.

Indeed, Marceca's creditworthiness had been the vital component in influencing BAII to commit itself to the transaction in the first place. In BAII's credit analysis of the Marceca II loan, Nhan wrote: "The attractive aspects of this transaction are the experience of the developer [and] the liquidity and strength of his personal assets which back the personal guarantee...." Plaintiff's Ex. 6 at 10. Bucci testified that, in reviewing the due diligence Nhan had performed on the Marceca II loan, the credit committee was most concerned as to whether there had been an adequate assessment of the borrower's character as a developer and his capacity to convert the buildings. Trial Tr. at 91–92. It was only after Nhan had met with Marceca at the developer's office that the credit committee felt comfortable with the transaction. *Id.* at 92.

MNB argues that BAII engaged in insufficient due diligence by not asking the lead bank to meet with Marceca on subsequent occasions. The Court finds that this argument does not diminish the materiality of the co-sponsorship issue. While there is no question that BAII's due diligence could have been more vigorous, the due diligence of a participant is inherently constrained by the participation agreement it has with the lead bank. As BAII's expert in matters of commercial banking, Stephen F. Herman ("Herman") testified: "When you are a direct lender[,] you have a direct contract with the borrower. There is [sic] a lot of things you can do: Phone calls you can make, credit checking you can make. There is [sic] many things you can do that are open to you that are not open to you as a participant, because you have no right to do it; you could get yourself in a lot of trouble." *Id.* at 313. Herman explained that when a participant conducts a due diligence, it is not typical to have more than one get-acquainted meeting with the borrower, "because everything comes through the direct lender. So if you have any additional questions or if you have substantial questions you direct them to the direct lender." *Id.* at 316–17. Conversely, Herman reasoned, where the direct lender is aware of information that is material, it must pass that along to the participant. *Id.* at 322.

 Therefore, at some point after learning of the co-sponsorship issue, MNB should have disclosed to BAII that the Department of Law had raised questions concerning sponsorship of the loan. The question is when. Perhaps MNB need not have disclosed anything at the time of Diffenderfer's to whom it may concern letter. However, once the hearing had been held at the AG's office and MNB had been advised that there had yet to be a resolution of the issue, it should have recognized that the information was becoming increasingly more significant. At the very latest, MNB should have disclosed the co-sponsorship issue immediately prior to the signing of the Participation Agreement on September 29, 1988. Thus, the Court holds that prior to funding, the co-sponsorship issue was material.

### C. *Reliance*

#### 1. *No Presumption for Common Law Fraud*

Banque Arabe argues that once a plaintiff has established the element of materiality in a fraudulent concealment case, reliance is presumed and the burden shifts to the defen-

dant to rebut the presumption. Plaintiff bases this assertion on the rebuttable presumption provided in material disclosure cases under Rule 10b–5. In that context, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). This presumption recognizes that in a material omission case, it is often improbable that reliance can be based on something not disclosed. *Litton Indus. v. Lehman Bros. Kuhn Loeb, Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) ("Because in such situations, the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she would have been aware of the withheld information."). Although Banque Arabe indicates nowhere in its many submissions whether and why the *Affiliated Ute* presumption should apply to a common law fraud claim in New York, the Court infers that plaintiff seeks to argue this point by analogy.

However, plaintiff has improperly sought to incorporate the standards for Rule 10b–5 into a common law fraud claim. Case law has consistently held that the presumption of reliance afforded a plaintiff in a 10b–5 action does not apply to a common law fraud claim.

Because common law fraud claims must be supported by a showing of direct reliance on the misrepresentation or omission, they are distinct from actions brought under the federal securities laws, which "permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."

Common law fraud cases such as the present one are therefore to be distinguished from cases that involve a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims arising under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

*Turtur v. Rothschild Registry Intl., Inc.*, No. 92 Civ. 8710, 1993 WL 338205, 1993 U.S.Dist. LEXIS 11939 (S.D.N.Y. August 26, 1993) (citing cases).[10] Indeed, *Affiliated Ute* itself differentiated the anti-fraud provisions of securities law from common law fraud, when it explained that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Affiliated Ute Citi-*

---

**10.** The theory of "fraud on the market" asserts that in an open and developed market, such as a national securities exchange, price is dependent on available material information regardless of whether that information is true or false. Because any misrepresentation would be reflected in the price of the security, a plaintiff who relied on the integrity of the market price need not prove direct reliance on any misrepresentation in alleging that he has been defrauded. *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988) (adopting a rebuttable presumption of reliance in 10b–5 actions based on the fraud on the market theory).

As *Basic* clarified, in examining 10b–5 under a fraud on the market theory, the presumption of reliance occurs because of factors endemic to the market. The Supreme Court wrote: "The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b–5's reliance requirement must encompass these differences." *Id.* at 243–44, 108 S.Ct. at 990. Unlike a face-to-face transaction, such as a loan arrangement between two banks, the market operates as a font of information, which is transmitted to both buyer and seller in the form of price. "'In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer.... The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.'" *Id.* at 244, 108 S.Ct. at 990 (quoting *In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D.Tex.1980)).

Although this Court can envision cases outside of the securities context in which the existence of a market could support a presumption of reliance based on the fraud on the market theory, such conditions do not exist with respect to the participation loan arrangement between MNB and BAII. In a participation loan arrangement, there is, generally, no intermediate source of information. The information is provided specifically by the lead bank, and it is upon this information that the participant asserts its fraud claim.

*zens v. United States,* 406 U.S. at 151, 92 S.Ct. at 1471 (quoting *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963)). The securities laws are entrusted with the specific purpose of protecting the investing public and securing fair dealing in the securities markets " 'by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets.' " *Starkman v. Warner Communications, Inc.,* 671 F.Supp. 297, 302 (S.D.N.Y.1987) (quoting *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974)). The generous scope of this mandate does not correspond with the generally delicate way in which the law entertains common law fraud claims.

In a recent California Supreme Court case, *Mirkin v. Wasserman,* 5 Cal. 4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993), plaintiffs sought to have the reliance presumptions of securities law extended to common law claims. The court emphatically denied this request and reaffirmed the view that common-law fraud differs significantly from Rule 10b–5. It wrote:

> Rule 10b–5 was promulgated by the SEC under a broad, statutory grant of authority to adopt rules to prevent the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities.... Under this broad charter, the federal courts "have gone far beyond the limits of the common law in imposing liability under [Rule] 10b–5...."
> As a result, "[a]ctions under Rule 10b–5 are distinct from common law deceit and misrepresentation claims, and are in part designed to add to the protections provided investors by the common law."

*Id.* at 1089–90, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993) (citations omitted). Specifically, with respect to the *Affiliated Ute* presumption, *Mirkin* rejected the frequently held view that it is impossible to demonstrate

reliance in a cause of action for deceit based on something not being disclosed. To the contrary, the California Supreme Court reasoned, "it is not logically impossible to prove reliance on an omission. One need only prove that, had the omitted information been disclosed one would have been aware of it and behaved differently." *Id.* at 1093, 23 Cal.Rptr.2d 101, 858 P.2d 568.

■ Similarly, this Court will not apply the *Affiliated Ute* presumption to a common-law claim for fraud, and Banque Arabe must establish the element of reliance in order to make out a claim of fraudulent inducement. A plaintiff's burden is twofold. First, he must show actual reliance—that he actually relied on the information being disclosed—and, in addition, he has to show reasonable or justifiable reliance—that a reasonable participant would have considered the withheld information important in making a decision whether to fund. *Harris v. Camilleri,* 77 A.D.2d 861, 431 N.Y.S.2d 65, 68 (1980).

### 2. *The June Projections*

■ In its complaint, Banque Arabe alleged that BAII was relying on the June projections in determining whether or not to fund.[11] Concerning these projections, however, the Court finds, based on the evidence offered at trial, that BAII neither actually relied on them in making its decision nor would it have been reasonable for it to do so. Bucci's testimony confirms that BAII recognized that the projections were timing estimates understandably subject to change. But even more than BAII's recognition of the indefinite nature of projections, was Nhan's own admission in the credit analysis that the June projections might not be reliable. Nhan indicates that the red herrings, or the initial filings, might not be submitted to the Attorney General's office until December of 1989, later than was assumed in the June projections. Plaintiff's Ex. 6 at 7. At trial, plaintiff offered no evidence demonstrating

---

**11.** Paragraphs 36 and 38 of the Complaint address the element of reliance as follows:

> 36. BAII relied upon the repayment schedules in reaching its decision to purchase the $10 million Participation in the Loan.
>
> ....

> 38. MNB knew that BAII was relying upon the projected schedules and information in deciding whether to purchase its Participation interest, and intentionally failed to disclose to BAII either the delays in those schedules, the errors in the information, or the problems raised by the Department of Law.

that BAII actually believed that the Marceca properties would be converted in accordance with the June projections.

The trial did confirm, though, that a reasonably prudent participant in a real estate loan would not have relied on the June projections. After carefully reviewing the June projections, Restaino concluded that they were "utterly unrealistic." Trial Tr. at 807. Restaino explained that the projections were overly optimistic with respect to a variety of factors including timing and price levels. First, Restaino explained, the projections assumed that the conversion process, which takes even diligent converters up to two years to finish, could be accomplished in nine months. *Id.* at 808. Similarly, the projections assumed that each building would be sold out in twenty-one months, while Restaino depicted the sale of units as typically lasting ten to fifteen years. *Id.* at 809–10. Indeed, Restaino pointed out, even the appraisal recognized that the June projections were "utterly a fiction," when acknowledging that "it takes from one to two years for the conversion to occur, and ... that it's not unknown for the sellout to take five to ten years." *Id.* at 810.

Besides timing factors, Restaino concluded that sales prices in the paydown schedules were unrealistic. The schedules assumed a gross retail sellout to all outsiders, but Restaino explained that, on average, the buildings were eighty-three percent occupied. *Id.* at 812–13. Restaino testified:

> In my experience, the difference between outsider and insider sales prices are typically discounts of 40 to 60 percent are given to the insiders. 40 to 60 percent or more have to be given to insiders to induce them to give up the protections of rent regulation laws in New York. Whereas these projections assume that they obtain 100 percent of the, quote-unquote, market prices.

*Id.* at 813. Likewise, Restaino asserted that the projections assumed realization of gross sale proceeds, when, in reality, transaction costs are generally at fifteen percent of the sales price. Restaino also testified that the paydown schedules do not recognize expenses which would reduce the amount available to repay the loan. These expenses include: state gains tax, brokerage commissions, and property transfer taxes. *Id.*

Further, Restaino criticized the appraised value of the properties. In the projections, the average price used per room is in excess of $100,000, while Restaino claimed the realistic figure for the 1988 market would have been in the vicinity of $60,000 a room. *Id.* at 814–15. Moreover, the prices refer to renovated apartments, but the Marceca properties, Restaino maintained, were in a mediocre state of repair. *Id.* at 815. Restaino testified:

> The budget ... in this deal included an average of $1500 a room total renovation budgets, which were expected to cover not just the apartments but the base building. $1500 a room in Manhattan in 1988 gets you maybe the floor scraped and the walls painted. It certainly doesn't get you new kitchens and new baths. It doesn't get common areas brought up to the standards that are incorporated in the Halstead report. It doesn't repair infrastructure of the building such as plumbing that might be 40, 50, 60 years old or heating plants that might be that old.

*Id.* at 816. In short, Restaino's assessment of the loan, based on the viability of the June projections, or the lack thereof, was "that it was a nonstarter the day it was made. It had as much chance of being repaid as I do of jumping over the moon." *Id.* at 830.

Restaino's expert testimony, in which the projections were derided on almost all accounts as "utterly unrealistic," may exaggerate their deficiencies from the benefit of hindsight, but it nevertheless undermines their reliability. It is clear to this Court, that through its due diligence or from its own experience, BAII should have recognized that it could not rely on the total accuracy of the June projections in determining whether or not to purchase a participation interest in the Marceca II loan.

### 3. *The Co–Sponsorship Issue*

 Yet, the gravamen of plaintiff's fraud claim is not really centered around reliance on the June projections. Banque Arabe has

argued that, had it known of the co-sponsorship issue, it would not have funded the participation. In essence, then, the reliance analysis revolves around the question of whether BAII would have behaved any differently had it known of the co-sponsorship issue. As stated above, the co-sponsorship issue was certainly material to BAII's understanding of the status of the Marceca loan. Clearly, with this information in hand, a reasonably prudent participant would have been hesitant about funding. The only question which remains is whether BAII actually would have relied on this information had it been disclosed.

At trial and in its post trial submission, Banque Arabe revised its reliance argument and asserted that BAII would have relied on the co-sponsorship information because it concerned the essential component of Marceca's character and capacity. BAII's argument, as discussed *supra*, is based on Nhan's credit analysis, which stated at the outset that Marceca's conversion of over one hundred Manhattan properties in the last twenty years demonstrates that "[h]e is therefore very experienced in this rather specialized form of property development in which the timing of the acquisition and of the conversion, marketing savvy and negotiating skills are more important tha[n] the ability to design and build." Plaintiff's Ex. 6 at 4. The credit analysis further stated: "Robert Marceca is very experienced in coop conversions and this is a critical factor ... [and] of paramount importance in a successful conversion." *Id.* at 10. In short, BAII argues that insofar as repayment was dependent on successful conversion of the buildings, Marceca's ability to convert stands out as the key ingredient. Therefore, when MNB failed to disclose information of the co-sponsorship issue to BAII, it deprived MNB of the opportunity to thoroughly assess Marceca's ability to convert based on information that called into question Nhan's credit analysis.

While in the complaint and in its many submissions, Banque Arabe appeared to be arguing that the co-sponsorship issue was material because of the effect it had on the June projections, this Court has decided to consider plaintiff's subsequent argument that the co-sponsorship issue would have affected BAII's view of Marceca's character and capacity. Besides the credit analysis, Marceca's character and capacity were underscored by Bucci, when he testified that the credit committee did not initially approve the transaction because Nhan had failed to meet with Marceca. Once BAII had complied with its due diligence obligations by meeting the developer, it was then permitted to rely on MNB for subsequent information concerning the developer's ability to convert the properties. By failing to disclose the co-sponsorship information to BAII, MNB forced the participant to make its decision to fund by relying on a material omission.

### D. *Causation*

The Court also needs to consider whether Banque Arabe sustained damages that were proximately caused by non-disclosure of the co-sponsorship issue. MNB argues that the actual proximate causes of the damages sustained by BAII were (1) poor judgment in evaluating the merits of the loan at its inception and (2) a disastrous downturn in the New York real estate market at the end of the 1980s.

■ There is no question that BAII's due diligence was far from exemplary. Its own expert, Herman, assessed BAII's performance as "adequate" and assigned it a grade of "C to C +." Trial Tr. at 307. Restaino's unrebutted criticism of the appraisal and the June projections leads this Court to believe that BAII's due diligence perhaps deserved an even lower grade. The existence of a participation agreement is no excuse for a deficient due diligence investigation.

■ Nonetheless, the participation arrangement, as explained earlier, definitely constrains the participant. Especially on material matters, a participating bank is expected to rely on the lead bank as its source of knowledge and not actively seek out information from either the borrower or an outside source, such as a regulatory agency. The co-sponsorship issue was material to the Marceca II loan. It called into question the possibility that Marceca would not be capable of converting the properties. BAII relied on

Marceca's reputation and his ability to convert as the crucial factor in its decision to fund. Thus, in this Court's view, MNB's poor judgment in not disclosing the co-sponsorship issue to BAII was equally as much a contributing cause to the damages plaintiff suffered as BAII's weak due diligence.

Similarly, the co-sponsorship issue was as much a factor in BAII's loss as were market factors. The decline of the real estate market at the end of the 1980s certainly eroded the price at which cooperative apartments in New York could be sold. But if all eight buildings had been approved for conversion and the apartments made available for sale, BAII would not have lost most of its participation interest. Although the market decline may have eliminated Marceca's equity and much of the appraised value of the buildings, Marceca never got to the market in the first place and the banks never received the benefit of enhanced collateral value stemming from conversion. Accordingly, even though other factors contributed to BAII's loss, the Court finds that MNB's failure to disclose the co-sponsorship issue was a proximate cause of BAII's sustaining damage.

### E. Scienter

 Generally, proof of fraudulent concealment must include evidence of scienter on the part of the defendant. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 152 (2d Cir.1993). As a matter of law, Banque Arabe argues that, by seeking rescission, it need not establish scienter. Plaintiff relies on cases in which courts have held that even innocent misrepresentations are grounds for rescission. *See e.g., Rush v. Oppenheimer & Co., Inc.,* 650 F.Supp. 682, 683 (S.D.N.Y.1986) ("scienter is not necessary to make a contract induced by a misrepresentation voidable; so long as the misrepresentation is material, an unknowing misstatement constitutes grounds for revocation or rescission."). However, this innocent misrepresentation exception to the scienter re-

quirement refers specifically to a situation in which the parties to a transaction are *mutually mistaken* about the terms of the contract. A court may reform or rescind an agreement, "where it finds either mutual mistake or one party's unilateral mistake coupled with some fraud or wrongful conduct of the other party. . . . Unilateral mistake without fraud or wrongful conduct, however, is not a sufficient ground for contract rescission or reformation." *National Union Fire Ins. Co. v. Walton Ins. Ltd.,* 696 F.Supp. 897, 902 (S.D.N.Y.1988). In the instant action, plaintiff argues that BAII was unilaterally mistaken about the status of the Marceca loans, and therefore it needs to allege fraud, including the element of scienter, in order to prevail on its rescission claim.

Scienter refers to the "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (private cause of action under Rule 10b–5 will not lie without an allegation of scienter). In securities law, the Second Circuit has determined that reckless disregard for the truth can constitute scienter under Rule 10b–5. *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 44–47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Ades v. Deloitte & Touche,* 799 F.Supp. 1493, 1499 (S.D.N.Y.1992) (citing *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir. 1991)). "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 47 (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977)); *see also, Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989) (scienter based on recklessness can occur when there is "[a]n egregious refusal to see the obvious, or to investigate the doubtful."). Whether recklessness is sufficient to prove scienter in a common law fraud action, however, is unclear.[12]

---

**12.** In *Rolf,* the Second Circuit explained that recklessness applied to Rule 10b–5 actions because "the common law has served as an interpretive source of securities law concepts," and "[t]he common law tort of fraud has adopted a recklessness standard as one means of satisfying the requisite intent element of that cause of action." *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 45–46. But, as was discussed in the section on reliance, *supra,* the prevailing view is

In alleging scienter, where there is no direct knowledge of defendant's state of mind, plaintiff has two options. He can infer scienter either from facts showing that the defendant had a motive to defraud and an opportunity to do so, or from circumstantial evidence demonstrating conscious behavior on the part of the defendant. *Zvi Trading Corp. Employees' Money Purchase Pension Plan and Trust v. Ross (In re Time Warner Inc. Securities Litigation )*, 9 F.3d 259, 269 (2d Cir.1993). According to Banque Arabe, both MNB and the MNCIB officials assigned to the Marceca II loan had financial and personal incentives motivating fraudulent behavior in ensuring that BAII participated in the loan. In particular, Banque Arabe alleges that BAII's participation lightened MNB's exposure to the risk of loss on the entire Marceca account. Plaintiff contends that, because the funded participation would effectively lower the risk on the Marceca loan, it would concurrently increase fee income which would translate into higher bonuses for MNCIB officials. Banque Arabe also asserts that the MNCIB officials had a motive to defraud because the Marceca II loan was a large transaction for MNB and thus professional reputations were at stake. In addition, Banque Arabe argues that MNB acted with conscious disregard of the truth because even though Beldock and others had informed and updated Diffenderfer concerning the co-sponsorship issue, the information was withheld from BAII.

■ The Court finds, first, that nothing offered at trial suggests that MNB exhibited conscious disregard of the truth when it failed to disclose the co-sponsorship issue to BAII. Throughout his correspondence with Beldock, both in letters and on the telephone, Diffenderfer was led to believe that the co-sponsorship issue would be resolved shortly, that the Department of Law's concerns were without merit and that the issue was not material. Although this Court has found that Diffenderfer should have disclosed the information to BAII before funding, his failure to do so was more an error of judgment than any deliberate attempt to defraud BAII. Even were the Court required to assess MNB's behavior by a recklessness standard, it would not find that defendant departed "extremely" from ordinary care or that it "egregiously" refused to see the obvious or investigate the doubtful. In hindsight it is easy to ascribe evil intent or, at least, gross indifference to Diffenderfer's failure to disclose. But based on the evidence, in August and September of 1988, Diffenderfer was monitoring the Marceca II loan with a sense that the AG's concerns were minor impediments that did not warrant sounding alarm bells.

Moreover, BAII's claim that MNB and the MNCIB officials stood to gain financially and professionally from the participation is not sufficient evidence, and certainly not clear and convincing proof, of a motive to commit fraud. Obviously, MNB would profit by a participant acquiring a portion of the Marceca II loan, and a financial motive buttressed by other evidence showing a sinister intent could serve as a motive for fraud. But the prospect of profit is an objective of every participation agreement, and for that matter every loan. Were financial motive alone enough to prove scienter, the intent to defraud would be presumed in every loan participation dispute. BAII has not offered any additional evidence of a motive to commit fraud short of the profit rationale, and has, therefore, not established clearly and convincingly that MNB acted with the requisite intent to defraud.

The Court summarizes its findings with respect to the fraud claim. Although, in

---

that Rule 10b–5 is not based on common law fraud and its standards are more lenient. *Basic, Inc. v. Levinson*, 485 U.S. at 244 n. 22, 108 S.Ct. at 990 n. 22 ("Actions under Rule 10b–5 are distinct from common law deceit and misrepresentation claims"); *Strauss v. Long Island Sports, Inc.*, 60 A.D.2d 501, 401 N.Y.S.2d 233, 237 (1978) ("10b–5 cases are very much distinguishable from common-law fraud cases."); *Mirkin v. Wasserman*, 5 Cal. 4th at 1089, 23 Cal.Rptr.2d 101, 858 P.2d 568 ("The characteristics of a private action under Rule 10b–5 are not derived from, or identical to, the common law of deceit."). Some courts, in fact, have explicitly stated that the standards for scienter are stricter for common law fraud than for Rule 10b–5. *du Pont v. Brady*, 646 F.Supp. 1067, 1075 (S.D.N.Y.1986) (citing cases), *rev'd on other grounds*, 828 F.2d 75 (2d Cir.1987).

August and September 1988, MNB did not have a duty to disclose the June projections to BAII, it did have a duty to disclose the co-sponsorship issue. The June projections were not material and BAII did not rely on them in deciding to fund. On the other hand, the co-sponsorship issue was material and BAII would have relied on the information. In addition, the co-sponsorship issue was a proximate cause of plaintiff's loss. Nevertheless, Banque Arabe has failed to make out a fraud claim against MNB because plaintiff did not show by clear and convincing evidence that defendant acted with the requisite intent to defraud.

### CONCLUSION

For the foregoing reasons, the court finds that Banque Arabe: (1) was not the real party in interest and lacked standing in this action; (2) raised its rescission claim promptly and did not ratify the Participation Agreement; and (3) failed to show by clear and convincing evidence that MNB engaged in fraud.

The Clerk is directed to enter judgment for defendant with costs.